UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACV Auctions, Inc., | Index No. |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| National Auto Auction Association, Inc., Auto Auction Services Corporation, Manheim Auctions, Inc., ADESA US Auction, LLC, ADESA, Inc., ServNet Auction Group, and Independent Auto Auction Services Corporation d/b/a Independent Auction Group, | |
| Defendants. | |

## INTRODUCTION

1.     ACV Auctions, Inc. ("ACV") is an online service provider that is transforming the wholesale used vehicle industry.  ACV's platform offers "Auction Services"—services that allow buyers and sellers of wholesale used vehicles to participate in auctions.  In particular, ACV's platform provides online Auction Services that are not only convenient, but also transparent, trustworthy, and efficient.  Yet, a group of entrenched horizontal competitors—who traditionally have provided only antiquated, in-person Auction Services ("Physical Auctions")—have conspired to prevent competition from newer, more innovative online wholesale used vehicle auction platforms like ACV.  ACV brings this antitrust action to stop this unlawful horizontal group boycott.

2.     Wholesale Auction Service providers like ACV play an essential role in ensuring that retail consumers can purchase used vehicles.  In order to have the inventory necessary to fulfill the demand for used vehicles by retail consumers, dealerships must first obtain vehicles wholesale.  Dealerships cannot obtain all the used vehicles they need through trade-ins by retail consumers,

so dealerships must look elsewhere. One way dealerships obtain that wholesale inventory is through vehicle auctions where two groups of sellers participate: (1) used car dealers, and (2) large-scale consignors with significant vehicle fleets ("Commercial Consignors"). Used car dealers can use an auction provider to get rid of excess used vehicles and rebalance their inventory. And Commerical Consignors—including government agencies, insurance agencies, banks, and car leasing companies—can use auctions to unload used vehicles once they are no longer needed.

3.      Historically, these Auction Services were provided only in person at Physical Auctions located at various regional and local sites throughout the United States. But companies like ACV have sought to bring the vehicle auction process into the digital age. Instead of buyers, sellers, and their vehicles having to travel to the same physical sites for pre-scheduled auctions, ACV's platform enables dealerships to purchase used vehicles from anywhere in the United States through a 20-minute live, online auction. This business model saves wholesale buyers and sellers time and money, and so, it is no surprise that ACV has found success: It is now one of the leading digital marketplaces providing wholesale Auction Services.

4.      Now, Physical Auctions must compete with ACV and other online marketplaces to offer Auction Services to used vehicle wholesellers and buyers. In particular, ACV competes with Defendants, which consist of entities that have a dominant position in wholesale Auction Services. Manheim Auction Inc. ("Manheim") and ADESA US Auction, LLC[1] are currently the two largest

---

[1] As explained further below, in 2022, Carvana purchased the ADESA U.S. physical auction business through an asset purchase agreement. This included all auction sales, operations, and staff at 56 ADESA U.S. Physical Auctions/vehicle logistics centers and exclusive use of the ADESA.com marketplace in the U.S. Prior to the transaction and creation of ADESA US Auction, LLC, ADESA, Inc. owned and operated these U.S. based Physical Auctions. To facilitate the asset purchase, these assets were transferred to ADESA US Auction, LLC and ADESA US Auction, LLC was transferred to a Carvana subsidiary. Because the anticompetitive conduct at issue in this action began before the split of its business operations, herein, "ADESA" refers collectively to ADESA US Auction, LLC and ADESA, Inc. and their subsidiaries and successors in interest.

Physical Auction companies.  Their Physical Auctions have been in business for 77 and 33 years, respectively.  Manheim and ADESA control 150 Physical Auction locations spread throughout the United States and provide approximately 70.3 percent of wholesale vehicle Auction Services. There are also numerous smaller Physical Auction providers, commonly referred to as independent auto auctions, which also have existed for decades.  Although they lack the size and scale of Manheim and ADESA, they are often affiliated through auction networks like Defendant ServNet Auction Group ("ServNet") or trade associations like the Independent Auto Auction Services Corporation d/b/a Independent Auction Group ("IAG").  There is limited competition among these independent Physical Auction providers, primarily due to geographical constraints, as many of the independent auto auctions are limited to certain states or regions.

5.    These Defendants have responded to ACV's success by conspiring to limit ACV's access to legacy inventory management software that most large-scale Commercial Consignors require Auction Service providers use.  In particular, Defendants Manheim, ADESA, ServNet, and IAG have used their control over Defendants National Auto Auction Association, Inc. ("NAAA") and Auto Auction Services Corporation ("AASC") to deny ACV access to critical software called AutoIMS.    AutoIMS is the "industry standard inventory management platform" used by "[n]ational fleet management companies, lease companies, banks and finance companies … responsible for the remarketing of literally millions of off-lease vehicles each year."  Most Commercial Consignors exclusively use AutoIMS to track their inventory throughout the auction process.  There are no other reasonable alternatives to AutoIMS.  Even if a new platform was developed, many Commerical Consignors have built their entire operations around AutoIMS and would need to expend significant resources to adopt new processes to accommodate an alternative platform.

6.      Although Defendants historically have provided two access points by which an Auction Service provider could obtain a license to AutoIMS, Defendants have erected new restrictions to prevent ACV from doing so.

7.      First, Defendants have prevented ACV from obtaining AutoIMS access by virtue of NAAA membership.  One of the benefits of NAAA membership is that members in good standing automatically qualify for a license to AutoIMS.  But when in late 2018 Plaintiff ACV applied for membership in NAAA, its application was denied because ACV's business did not conduct Physical Auctions.  That decision was made by the executive leadership and Board of Directors of NAAA, which at that time consisted of representatives from Defendants Manheim and ADESA, as well as members of Defendants ServNet and IAG.  These Defendants' Physical Auctions have collectively benefitted from foreclosing potential competition by ACV for commercial consignment transactions.

8.      Second, Defendants have prevented ACV from obtaining a license directly. Entities can apply for a license directly from Defendant AASC, a joint venture created by Defendants Manheim, ServNet, IAG, and ADESA.  Despite having promised to license AutoIMS to anyone in the "entire auction industry"—a promise made to induce Commercial Consigners to adopt AutoIMS as the industry standard for inventory management—Defendant AASC has denied ACV's request for a license.  AASC's President and CEO informed ACV in July 2019 that AASC's Board unanimously agreed to deny access to ACV.  At that time, AASC's Board consisted of representatives from Defendants Manheim, ADESA, ServNet, and IAG (i.e., the same horizontal competitors that controlled NAAA).

9.      The motivation for these decisions is clear.  Defendants limit access to AutoIMS anticompetitively and discriminatorily to bar innovative companies that threaten the market power of Manheim, ADESA, and other Physical Auctions.  As one NAAA member has acknowledged:

> ***The NAAA is whatever Manheim wants it to be***.  Some of the rules and requirements stated above were written and amended in the 90's to ensure that Mobile Auction Platforms like, Autovest, Neal Auctioneers and Your Auction could NOT become members of the NAAA. . . . ***[O]ther rules . . . were adopted mostly to preclude Smart Auction, or any other digital only platform, from ever gaining membership***.

10.     By illegally limiting competition from ACV and other online platforms, Defendants are buying time for Defendants and other Physical Auctions to create and improve their own digital online marketplaces.  Since 2018, for example, Manheim and ADESA have invested significantly in their digital platforms in an attempt to catch up to ACV and other online auction platforms.

11.     Defendants' unlawful conduct violates Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), the Clayton Act (15 U.S.C. § 15) and the Donnelly Act (N.Y. Gen. Bus. Law § 340(1)).   Defendants have orchestrated a group boycott, which has illegally restrained competition for Auction Services that are integrated with a standardized vehicle inventory management system ("Standardized Vehicle Inventory Management System").  Without access to AutoIMS, ACV and other online marketplaces are unable to facilitate auctions involving the vehicles being sold by financing institutions, insurance companies, government agencies and other large businesses that are locked into the AutoIMS platform.

12.     This group boycott not only harms ACV, but also competition more generally. Defendants' conduct has resulted in higher costs to consignors and higher prices paid by consumers to obtain used vehicles.  Absent Defendants' unlawful horizontal conspiracy, the cost savings and quality/service improvements resulting from ACV's online marketplace would be passed both upstream and downstream.  Those benefits would reduce prices paid by buyers of used vehicles and increase the amount received by sellers of used vehicles, ultimately benefiting individual retail consumers for used vehicles.

13.     The harm to retail consumers resulting from Defendants' illegal conspiracy is particularly acute given current economic conditions.  Due to a global shortage of computer chips, the availability of new automobiles has plummeted.  Many consumers instead are turning to used vehicles.  As a result, the average price for used vehicles has increased by more than 30 percent since the beginning of the pandemic.  The various cost savings resulting from ACV's online platform could help ease the rising prices of used automobiles, but have been blocked by Defendants' illegal horizontal group boycott.

14.     In short, Defendants are engaging in the type of conduct most condemned under antitrust law.  Instead of competing on the merits in response to a disruptive, innovative new business model, Defendants are collectively joining forces to artificially insulate their outdated business models from effective competition while they attempt to retool for the digital age.  Defendants' horizontal group boycott of ACV is an unreasonable restraint of trade per se, inflicts substantial anticompetitive effects in commercial consignment transactions with no offsetting procompetitive benefits, and violates federal and state competition laws.

## JURISDICTION, VENUE, AND COMMERCE

15.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain injunctive relief and to recover damages and costs of suit, including reasonable attorneys' fees and costs, for the injuries sustained by Plaintiff as a result of Defendants' violations of the Sherman Act, 15 U.S.C. § 1 et seq., as alleged herein.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

17.     Defendants' violations occurred in and directly affected United States commerce. These violations give rise to Defendants' claims in this action under the Sherman Act.

18.     Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. § 1391(b), (c) and (d), because during all times relevant to this action, Defendants resided, transacted business, maintained offices, maintained agents, or were found in this District, and because a substantial part of the events giving rise to Plaintiff's claims, and a substantial portion of the affected interstate trade and commerce as described below, occurred, and were carried out, in this District.  Defendants also inserted products or services in the stream of commerce that were intended to and did reach this District.

### PARTIES

19.     **Plaintiff ACV Auctions, Inc. ("ACV")** is a Delaware corporation with its principal place of business at 640 Ellicott Street, Buffalo, New York 14203.  Founded in 2014, ACV offers an online platform that facilitates auctions between wholesale buyers and sellers of used vehicles.

20.     **Defendant Manheim Auctions Inc. ("Manheim")** is organized and existing under the laws of the State of Delaware, with its principal place of business at 6205-A Peachtree Dunwoody Road, Atlanta, Georgia 30328.  Manheim competes to host auction sales of used vehicles.  Through its 115 physical and digital auction sites, Manheim handles the auctions of approximately eight million vehicles annually.  Manheim facilitates transactions valued at nearly $57 billion annually and generates annual revenue of more than $2.6 billion.  Manheim is a founding member and owner of AASC and has a seat on its Board of Directors.  Manheim also is a leader of NAAA, with representatives serving as Executive Officers and on NAAA's Board of Directors.

21.     **Defendant ADESA US Auction, LLC** is organized and existing under the laws of the State of Delaware, with its principal place of business at 1930 W. Rio Salado Parkway, Tempe, Arizona 85281.  In the spring of 2022, ADESA, Inc.'s 56 Physical Auction sites in the United

States were sold to Carvana, an online used car retailer based in Tempe, Arizona, in a deal valued at approximately $2.2 billion.  The deal entailed the acquisition of the ADESA U.S. Physical Auction business, which included all auction sales, operations and staff at ADESA's U.S. vehicle logistic centers and use of the ADESA.com marketplace in the U.S. Carvana's press release announced:  "Carvana will continue to operate and expand ADESA auction business under the leadership of ADESA President John Hammer."  Upon information and belief, ADESA US Auction, LLC is the holding company for these assets.

22.    **Defendant ADESA, Inc.** is organized and existing under the laws of the State of Delaware, with its principal place of business at 11299 North Illinois Street, Carmel, Indiana 46032.  Prior to the 2022 sale of its 56 US based ADESA Physical Auctions, ADESA, Inc. was the second-largest provider of used vehicle Auction Services in North America.  ADESA, Inc. competed to host auction sales of used vehicles.  In 2019, ADESA, Inc. facilitated the sale of approximately 3.8 million used vehicles via its network of 74 physical and digital auction sites. ADESA, Inc. is a founding member of AASC and, until the Carvana asset purchase, had a seat on AASC's Board of Directors.  ADESA, Inc. also is a leader of NAAA, with a representative serving as one of NAAA's Executive Officers.

23.    Because the anticompetitive conduct at issue in this action began prior to the split of ADESA, Inc.'s business operations, herein, "**ADESA**" refers collectively to ADESA US Auction, LLC and ADESA, Inc. and their subsidiaries and successors in interest.

24.    **Defendant ServNet Auction Group ("ServNet")** is a corporation organized under the laws of the state of Tennessee, with its principal place of business at 707 Castleview Drive, Chattanooga, Tennessee 37421.  ServNet is a network of "America's best strategically located independently-owned wholesale auto auctions," which compete to host auction sales of used vehicles.  Examples of independently owned wholesale auctions are Greater Rockford Auto

Auction, Richmond Auto Auction, and Southern Auto Auction.  ServNet is a founding member

and owner of AASC, and many of the Physical Auctions in its network (for example, the three

independent auctions above) serve in leadership roles as NAAA Executive Officers and Board

Members.

25. **Defendant Independent Auto Auction Services Corporation d/b/a Independent Auction Group ("IAG")** is a corporation organized and existing under the laws of

the State of Maryland, with its principal office in the state at 2405 York Road, Suite 201,

Lutherville-Timonium, Maryland 21093.  IAG is a trade association to further the objectives of

independently owned Physical Auctions, which compete to host auction sales of used vehicles.

IAG is a founding member and owner of AASC.  IAG's mission is "to unify, protect and promote

NAAA member independently owned auctions and to sustain an alliance for industry standards

and developments."  IAG furthers this mission by "provid[ing] representation for the independent

auction body as a whole on the NAAA's Executive Committee, Board of Directors, and in all

policy related matters."

26. **Defendant National Auto Auction Association, Inc. ("NAAA")** is a trade

association whose members include companies that compete to host auction sales of used vehicles.

It also controls one of the two access points for obtaining AutoIMS, the industry-standard

inventory management system.  NAAA is organized under the laws of the State of Colorado, with

its principal place of business at 7175 York Street, Denver, Colorado 80229.  NAAA's stated

mission is to "provide[] a unified voice for the auto auction industry, [and] protect[] and promote[]

the interests of its members."   NAAA's most senior leadership includes representatives of

Defendants Manheim, ADESA, and members of ServNet and IAG.

27. **Defendant Auto Auction Services Corporation ("AASC")** is a corporation

organized and existing under the laws of the State of Maryland, with its principal office in this

state at 351 West Camden St., 6th Floor, Baltimore, Maryland 21201.  AASC's principal business address is 50 Glenlake Parkway N.E., Suite 400, Atlanta, Georgia 30328.  AASC was created in 1997 as a joint venture of Defendants Manheim, ADESA, ServNet, and IAG.  AASC developed, owns and controls AutoIMS, the industry-standard inventory management system for commercial consignment transactions.  Until at least the spring of 2022, AASC's Board of Directors was comprised solely of representatives of Defendants Manheim, ADESA, and members of ServNet and IAG.

## FACTUAL ALLEGATIONS

### I.    Wholesale Auto Auctions

28.    There are more than 130,000 used car dealerships throughout the United States. Each year, these dealerships sell millions of used automobiles to retail consumers.

29.    These used car dealerships must obtain the vehicle inventory they offer retail consumers.  Some of that inventory comes from trade-ins from retail consumers visiting the dealership.  But much of that inventory comes from wholesale sellers of used vehicle stock.  That includes other used vehicle dealers.  And, as will be explained further below, it also includes wholesale inventory obtained from national finance companies (such as GM Financial Services Co. and CapitalOne Auto Finance), and national fleet owners/operators (such as the federal government and insurance companies).  These wholesale sellers (dealers and Commercial Consignors) regularly turn to auctions to facilitate transactions with would-be wholesale buyers.

30.    Wholesale auto auctions provide companies an outlet to sell used whole-car vehicles that are operable and have limited or no body damage.  Companies providing used vehicle Auction Services, such as ACV, connect used vehicle sellers with dealers and other commercial entities who are looking to acquire vehicles to resell to consumers.

31.     Historically, used vehicles sold at auction were transported to a physical location, where the vehicle would be stored and displayed to potential buyers prior to an on-site auction. Vehicle auctions would then be held on a weekly basis at that physical facility.  Bidders physically present at the auction site would submit bids to the auctioneer until the vehicle was sold to the highest bidder.

32.     In the last decade, the industry has started to change.  Used vehicles no longer are wholesaled only through Physical Auctions.  Industry upstarts, such as ACV, have developed online platforms that facilitate auctions between wholesale buyers and sellers of used vehicles. Other companies that historically have focused on Physical Auctions, like Defendants Manheim and ADESA, have also begun to expand into online auctions.  ACV, Manheim, ADESA, and others compete head-to-head to be the Auction Service provider for dealers and Commercial Consignors who sell used vehicles wholesale, whether conducted onsite or online.

33.     Companies that provide Auction Services not only facilitate the used vehicle auctions, but also provide a range of services for the vehicle sellers.  For example, they may retrieve the vehicle from the vehicle seller/consignor, transport it to a physical location, and store it pending the auction.  They also inspect vehicles and prepare them for sale.  Additionally, they handle administrative processing related to the vehicle's title.  Most important for this dispute, companies providing used vehicle Auction Services sell the vehicle—either through a live, in-person on-site, "brick and mortar," Physical Auction or, in ACV's case, through an auction conducted over the Internet.  Following the sale of the vehicle, proceeds are remitted by the auction host to the entity that consigned the vehicle for sale, after deducting a fee (either a flat fee or a percentage of the sales price) and incurred costs for the sale of the vehicle.  Finally, the auction host may also charge a transaction fee to the new buyer of the vehicle.

34.     There are two separate and distinct groups of sellers that utilize auction platforms to make wholesale used vehicle sales:  (1) used car dealers; and (2) Commercial Consignors.

35.     Used car dealers consist of auto dealerships whose primary business is to sell new and/or used vehicles to consumers.  Used car dealers typically use wholesale auctions to sell some of their used vehicle inventory to other dealers.  The used vehicles that used car dealers try to sell through wholesale auctions typically consist of consumer trade-ins, loaner cars, and other excess dealer inventory.

36.     "Commercial Consignors" are commercial or governmental entities that own and/or maintain large fleets of vehicles covering either multiple states or nationwide.  Commercial Consignors include (i) vehicle manufacturers and their captive finance subsidiaries, (ii) financial institutions, (iii) commercial fleet operators, and (iv) government agencies.   Commercial Consignors include well-known entities like Ally Financial, Honda Financial Services, and Capital One Auto Finance.

37.     Because Commercial Consignors must track a large volume of inventory over a potentially large geographic area, they need a comprehensive easy-to-use vehicle inventory management system ("Vehicle Inventory Management System").  Most Commercial Consignors use AutoIMS for this purpose.  For example, in 2021, approximately 78.6 percent of all car leases were processed using AutoIMS, and approximately 64.6 percent of all car loans were processed using AutoIMS.  The vast majority of remaining car leases and loans were processed by much smaller Commercial Consignors who each handle less than 2 percent of all new car leases and loans.

38.     Commercial Consignors also use AutoIMS in connection with auctioning used vehicles.  When AutoIMS is integrated with an auction platform, Commercial Consignors can use it to track and manage vehicles through each step of the auction process, exchange vehicle and

auction data, and create standardized reports using a single, consistent interface.  AutoIMS also serves as the bridge between auction and the post-sale accounting.

39.      Due to promises by Defendants that AutoIMS would be broadly licensed to the entire wholesale automotive industry, Commercial Consignors have designed their business operations around AutoIMS.  As a result, Commercial Consignors *require* that the entities with which they consign used vehicles for auction have access to AutoIMS, and they are unwilling to manually design around these integrated processes due to the significant cost and time of doing so.  Thus, companies that host auctions and wish to compete for Commercial Consignors' business must have a license to AutoIMS.

## II.   Development of AutoIMS as the Industry Standard

40.      Prior to the introduction of AutoIMS, there was no standardized interface for auctions and Commercial Consignors to exchange data and manage wholesale used vehicle remarketing inventory.  Because Commercial Consignors have large volumes of inventory spread throughout the country, they have historically worked with multiple different auction providers at any given time.  As a result, Commercial Consignors used different inventory management network systems to connect with each auction with whom they worked.  The absence of a standardized system thus posed logistical challenges for Commercial Consignors and resulted in inefficiency and greater costs.

41.      These logistical hurdles created a prime opportunity for a standardized system that would potentially result in substantial network effects.  In or around late 1997, a group of Physical Auction horizontal competitors—Defendants Manheim, ADESA, ServNet, and IAG— recognized this opportunity and formed AASC.  AASC was created, in part, to design an industry-standard electronic inventory management system for Commercial Consignors.  AASC was the result of a proposal at a NAAA Convention that was held in San Diego in the fall of 1997.

42. The result of this effort was AutoIMS.  As discussed above, AutoIMS provides a single, standardized system that enables Commercial Consignors to upload identical information about all of their vehicles to a unified online system, consign a vehicle to any AutoIMS-enabled Physical Auction in the United States with that system, and track updates to those vehicles—even as they are housed at different auction sites.

43. The commercial consignment process using the AutoIMS management system is illustrated in the below figure, excerpted from an AutoIMS marketing brochure:



| | Consignor | AutoIMS | Auto Auction |
|---|---|---|---|
| 1 | Auction assignment is added via AutoIMS. | AutoIMS creates record and exchanges data between client and auction. | Assignment is received and acknowledged. Now processes can be tracked in AutoIMS. |
| 2 | Track transportation and view status on AutoIMS. | AutoIMS provides a vehicle release form for transport. | Transportation is tracked until vehicle is secured at auction. |
| 3 | Title is sent to auction. | View all data on the AutoIMS "Vehicle Summary" page. | Auction receives title; prepares and transmits condition report. |
| 4 | Client accesses auction condition report, then may request reconditioning via AutoIMS. | View damages and approve repairs on AutoIMS. | Auction reconditions and details vehicle to increase value as requested. |
| 5 | Client sets Floor Price using vehicle information in AutoIMS. | Clients may use LivePricing (guide book valuation combined with CR). | Vehicle is sold at auction. |

AutoIMS maintains all vehicle record data, allowing for easy reconciliation of sales, historical reporting, trending analysis, and performance measurement.

44. Former AASC President Larry Brasher touted the benefits of AutoIMS to Commercial Consignors, stating:  "National fleet management companies, lease companies, banks and finance companies are responsible for the remarketing of literally millions of off-lease vehicles each year.  AutoIMS.com offers them a simple resource to monitor the status of each and every vehicle as its moves through the remarketing process."

45.     Defendants nonetheless recognized that there was a risk of low adoption by Commercial Consignors.  Upon information and belief, most Commercial Consignors would have declined to use AutoIMS if they thought they would be locked into only certain auctions.  Or they would have been hesitant to commit to any single inventory management system if they thought they might later have to incur substantial costs to switch to a new system or might have to simultaneously manage multiple systems to obtain the benefits of competition amongst various auction providers.

46.     Thus, Defendants needed to assure Commercial Consignors that AutoIMS would be widely available so that Commercial Consignors would benefit from robust competition for their used vehicle inventory.  Accordingly, Defendants promised that AutoIMS access would be available to any auction provider who requested it.  To that end, Defendants marketed AutoIMS as a "nonproprietary Internet system for use by the ***entire auction industry***."  To ensure the entire industry would have access, Defendants made AutoIMS available to members of the auto auction industry's primary trade association, NAAA.  Additionally, all Defendants (except NAAA) made AutoIMS directly available for license from AASC.  Moreover, founders Manheim, ADESA, ServNet, and IAG adopted AutoIMS.

47.     Despite Defendants' promise to openly license AutoIMS to the entire auction industry, Defendants continue to make up nearly all of the Auction Service providers with AutoIMS access.  Defendants' use of NAAA membership as a gateway to AutoIMS access has limited access to Physical Auction providers.  Indeed, Defendants Manheim, ADESA, ServNet, and IAG account for 97 percent of all NAAA members.  Further, Defendants Manheim, ADESA, ServNet, and IAG account for approximately 97 percent of all Physical Auction sites.  Because there are almost no online Auction Service providers with AutoIMS access that are not controlled

by Defendants, this means that Commercial Consignors that require an Auction Service provider with AutoIMS access must use Defendants' Auction Services.

48.     Given the dominant combined market share of Defendants Manheim, ADESA, ServNet, and IAG, and given the open licensing representation for AutoIMS made to the wholesale auto industry, AutoIMS quickly reached a tipping point and became the industry-standard management system for most Commercial Consignors.  In AASC's own words, AutoIMS became a "necessary infrastructure" for "[n]ational fleet management companies, lease companies, banks and finance companies … responsible for the remarketing of literally millions of off-lease vehicles each year."  Indeed, not only did it become the *industry standard*; it also became the *exclusive* inventory-management system used by most large Commercial Consignors.

49.     Since becoming the industry standard for used vehicle inventory management, most Commercial Consignors have designed their business operations around AutoIMS.  As a result, the substantial network effects arising from a single, widely adopted inventory management system are further accentuated by that system's deep integration with the business operations of Commercial Consignors.  And this, in turn, required entities seeking to facilitate auctions for Commercial Consignors to have a license to AutoIMS in order to compete.  Indeed, the AutoIMS website makes the connection between AutoIMS and the provision of auction services explicit, directly linking to a number of Defendants' auctions.

50.     Defendants have repeatedly marketed AutoIMS as an industry-standard system that is made available to the entire auction industry.  On June 12, 2000, *Automotive News* amplified AASC's standard marketing pitch, stating that, "Auto Auction Services was created to provide a nonproprietary Internet system for use by the *entire auction industry*."

51.     Furthermore, in the Fall 2012 edition of *AutoIMS News*, the then-President of AASC explained AutoIMS:  "The idea was to create one Internet platform that *everyone* could

connect to so as to save rewriting each system.  By bringing the latest technology to the largest group of users, it could **level the playing field for all participating auctions** and raise the level of technology **for the entire industry** at a fraction of the cost of everyone going it alone."

52.     Again, in a March 7, 2015, presentation, AASC's President described the system as follows:

# The Role of AutoIMS

*A single, standardized platform for consignors and auctions to manage and exchange vehicle data.*

*Value-added technology and business consulting services for the industry*



53.     Similarly, in an August 2019 press release, AASC billed itself as the "trusted technology service provider bringing together the wholesale remarketing industry[.]"  And, as recent as March 2022, AASC's website promoted:   "As the industry standard inventory management platform, AutoIMS can help."

54.     Defendants' repeated promises of open licensing had their intended effect.  Today, AutoIMS's widespread acceptance has created substantial network effects and locked in Commercial Consignors, creating a significant barrier to entry to potential competitors that could otherwise facilitate those transactions.  AutoIMS emphasizes these network effects in its marketing materials as follows:

**BEFORE:  INDIVIDUAL INVENTORY MANAGEMENT SYSTEMS**



**AFTER:  STANDARDIZED PLATFORM**



55.    Any attempt to create an alternative inventory management system—which would require the investment of extensive resources—would fail.  Most, if not all, Commercial Consignors are unwilling to bear the cost and trouble of working with an auction host without AutoIMS access, let alone transfer their data to an alternative system.  On information and belief, entities that have explored creating an alternative to AutoIMS, such as Alliance Auto Auctions,

have determined it would not succeed.  Therefore, an auction host without access to AutoIMS is unable to meaningfully compete for Commercial Consignor business.

56.     Worse, Defendants' promise that AutoIMS would be openly licensed to the entire wholesale auto industry has proven false.  More than ten years after AutoIMS was introduced, and after most of the largest Commercial Consignors designed their business operations around AutoIMS, ADESA admitted Defendants' intent to use their control over access to AutoIMS to stifle competition.  Specifically, ADESA's then CEO recounted that Defendants created AutoIMS in response to the threat that the internet would "revolutionize" the industry and replace "brick and mortar auctions."  He further explained that a standardized platform could be used as a barrier to protect the existing dominant Physical Auction houses from new online startups:

> As the newly appointed CEO of ADESA in 1996, I sat with many of the industry leaders:  Darryl Ceccoli with Manheim, Tony Moorby with ADT Automotive, and well-respected independents Larry Tribble, Ray Nichols Larry Brasher, and others to share thoughts on **how our industry could work together to put a fence around our customers, preventing outside third parties from putting us out of business**.
>
> The quote that has remained vividly in all our minds, and that has been referenced many times since, came from Darryl Ceccoli when he stated, "We need to jointly create a single system that we could offer to all our customers."

57.     AutoIMS was the realization of the Defendants' plan to insulate their Physical Auctions from potential disruptive competition.  AASC delivered AutoIMS "to the industry to preserve our **collective business interest** …."

## III.   ACV as a Disruptive Competitor

58.     The Physical Auctions model (which is still practiced by Defendants and most NAAA members) has many inefficiencies that limit vehicle choice for customers and result in increased prices and fees.  Such inefficiencies include:

a. *Substantial capital expenditure and investment*:  Physical Auctions require investment in a Physical Auction site and warehouses to store the vehicles and conduct the auction.

b. *Substantial overhead*:  Physical Auctions require the employment of licensed professional auctioneers, auctioneer assistants, clerks to auction the vehicles, and workers to manage auction crowds and drive vehicles through auction lanes.

c. *Limited seller base*:  Because they are live, Physical Auctions impose significant expenses on vehicle sellers, who must transport the vehicles to the Physical Auction site.

d. *Limited buyer base*:  Because they are live, Physical Auctions impose significant time demands on vehicle buyers, who are required to travel to and attend the live auction, incur expenses for travel, meals, and lodging, and wait for the desired vehicle to arrive on the auction block.  Successful buyers must then expend substantial costs to transport the vehicles from the Physical Auction site.

59.    ACV was founded in December 2014 to eliminate these inefficiencies.  ACV does not conduct Physical Auctions.  Started by an experienced veteran in the used car industry and a computer scientist, ACV's goal was to disrupt the traditional physical used vehicle auction model by introducing an innovative online-only marketplace for hosting used vehicle auctions.

60.    ACV launched its 20-minute online used vehicle marketplace in June 2015.  ACV's online platform, accessible by a smartphone app, enables consignors to buy and sell vehicles whenever they want from wherever they want in the United States.

61.     When a consignor wishes to sell a vehicle through ACV's 20-minute marketplace, the consignor goes through the following, simple process:

      a.     ACV dispatches a trained vehicle condition inspector to the consignor's physical site and provides a comprehensive condition report.

      b.     The consignor registers, or "lists," the vehicle.

      c.     Once completed, the consignor can launch the 20-minute live online auction at any time.

      d.     Once a vehicle is sold, ACV will finalize the sale documents and transport the vehicle directly to the buyer.

62.     By eliminating the need for sellers and buyers to leave their places of business, those entities can more efficiently manage their vehicle inventory and devote more time to their primary businesses.  And the reduced costs resulting from the online process—both for ACV's overhead relative to Physical Auctions, as well as the decreased travel expenses and lost time incurred by used vehicle buyers and sellers—ultimately are passed through to the individual retail purchasers of used vehicles due to the competitive nature of the used vehicle industry.

63.     Moreover, ACV's platform leverages data to power its digital marketplace and data services, enabling dealers and commercial partners to buy, sell, and value vehicles with confidence and efficiency.  The vehicle data that ACV makes available online to prospective purchasers is more detailed than that obtained at Physical Auctions.  For example:  ACV provides extensive condition reports for each of its vehicles, which includes information about the vehicle's title and history, wheels and tires, mechanicals, drivability, exterior and interior condition, frame and unibody, and warning lights.  This information gives potential buyers an in-depth understanding of the vehicle's condition and performance.

64.     ACV quickly grew to become one of the leading digital used vehicle marketplaces. ACV currently facilitates the sale of approximately 20,000 used vehicles per month across 100 geographies.  ACV has succeeded for a simple reason:  ACV's innovative business model saves buyers and sellers a lot of money.

65.     ACV mainly has found success in providing Auction Services to used car dealerships that want to auction their vehicles.  Those used car dealerships are attracted to ACV's innovative digital marketplace, and they aren't deterred from using ACV's platform because they do not require their Auction Service platforms to be integrated with inventory management software like AutoIMS.

66.     ACV has been less successful with Commercial Consignors, who do require inventory management software like AutoIMS.  When ACV has approached Commercial Consignors to use ACV's digital marketplace, Commercial Consignors have reacted positively to the ACV platform's ease of use and prospects of reduced costs.  However, one sticking point quickly and repeatedly emerged—the ability of ACV's platform to interoperate with AutoIMS.

67.     Commercial Consignors have repeatedly told ACV that they are unable to work with ACV because it lacks access to AutoIMS.  Because Commercial Consigners use AutoIMS for inventory management, they are unable to use their existing systems to manage and monitor their inventory on the ACV platform.  One Commercial Consignor told ACV that "once you figure out how to use AutoIMS, we will be happy to integrate with you."

**IV.    Defendants' Deny ACV Access to AutoIMS**

68.     Once ACV realized AutoIMS was necessary to do business with Commercial Consignors, ACV sought access to AutoIMS.  But, despite promises that AutoIMS would be broadly licensed to the entire wholesale auto industry, Defendants Manheim, ADESA, ServNet,

and IAG—collectively and through Defendants NAAA and AASC—have conspired to block ACV from obtaining access to AutoIMS.

69.     Recognizing ACV's success in competing for dealer-to-dealer transactions, those Defendants—all of whom are either horizontal competitors, or groupings of horizontal competitors (to each other and ACV)—have implemented and engaged in an illegal anticompetitive conspiracy to improperly exclude competition for Commercial Consignors' used car auctions.  Defendants' unlawful conspiracy is intended to artificially insulate them from competition, further entrench themselves against innovators like ACV, and deny Commercial Consignors, auto dealerships, and consumers the demonstrated benefits of the competitive process.

**A.  NAAA Denies ACV Membership and Thus Access to AutoIMS**

70.     NAAA's stated mission is to "provide[] a unified voice for the auto auction industry, protect[] and promote[] the interests of its members and lead[] with the highest ethical standards."  Yet, despite the rise of online auction platforms and the NAAA's purported representation of the entire auto auction industry, NAAA's website states *"[o]nline only auctions are not eligible for NAAA membership*."

71.     NAAA membership is purportedly governed by its bylaws.  Article III, Section 1 of NAAA's bylaws sets forth the eligibility requirements for Regular Members, including a requirement that all members maintain a physical auction site ("Physical Auction Requirement"):

> Any person or entity actively engaged in the wholesale auto auction business whose operation complies with Federal, State and Local laws, and principally provides auction services to buyers who are licensed motor vehicle dealers, and to sellers, in wholesale transactions involving motor vehicles that are not salvage, rebuilt or junk, shall be eligible for regular membership provided, that
>
> (a) A regular member must have an established place of business at which regularly scheduled weekly sales (except where natural disasters, acts of God, federal holidays, etc. preclude weekly scheduling) are conducted by auctioneers who are *physically*

>*present* to call for bids.  The established place of business *must include appropriate land, buildings, and offices*; the equipment and personnel necessary to provide the services customarily provided by wholesale auto auctions; and, at the weekly sales, the regular member must display moving vehicles as they are being offered for auction bids.  Buyers and sellers, at the weekly sales, must be given the opportunity to attend and participate in the auction process and have the opportunity to inspect and examine vehicles, vessels and/or equipment before, during and after the auction sale.

72.     NAAA's Executive Officers, Board of Directors, Membership Committee and Joint Marketing Committee are controlled by owners, executives, and/or employees from Defendants Manheim, ADESA, ServNet (and/or its member auctions), and IAG (and/or its member auctions).

73.     Defendants have used their control over NAAA to adopt anticompetitive membership requirements and to apply the membership requirements in a discriminatory and inconsistent manner.  They use that control to deny membership to innovative and disruptive competitors such as ACV.

74.     On or after August 27, 2018, ACV submitted a written application for NAAA membership.  Later in 2018, NAAA denied ACV's membership application, citing ACV's failure to satisfy the Physical Auction Requirement.  NAAA membership applications are accepted throughout the year and presented to the NAAA Membership Committee and the NAAA Board of Directors for approval either at the NAAA/CAR Conference (March) or the NAAA/NRC Conference (November).  In 2018, the Conference was held November 13-16, 2018.

75.     In or around January 2019, ACV's Chief Corporate Development and Strategy Officer, Craig Anderson, spoke to former NAAA Chief Executive Officer Frank Hackett about ACV's membership application.  Mr. Hackett told ACV that it was not eligible for membership.

76.     Some NAAA members have acknowledged that the Physical Auction Requirement has been used to preclude competition from innovative and disruptive competitors such as ACV. One NAAA member has publicly stated the following:

> ***The NAAA is whatever Manheim wants it to be***.  Some of the rules
> and requirements stated above were written and amended in the 90's
> to ensure that Mobile Auction Platforms like, Autovest, Neal
> Auctioneers and Your Auction could NOT become members of the
> NAAA.  Then, 20 years later when Manheim 'pioneered the mobile
> auction business' the rules pertaining to having a 'physical location'
> were changed to accommodate them.  ***The other rules . . . were
> adopted mostly to preclude Smart Auction, or any other digital
> only platform, from ever gaining membership***.  Now that Manheim
> (and Adesa) are 'pioneering' the digital auction business I can assure
> you the rules and regulations will be changed to accommodate them.

77.    NAAA has inconsistently and discriminatorily enforced the Physical Auction Requirement.  For example, NAAA has admitted and continues to have members that do not satisfy the Physical Auction Requirement and/or own "holding facilities" to park cars.  NAAA also has members that either:  (a) do not display moving vehicles as they are being offered to buyers for auction bids, or (b) do not have auctioneers physically present during auctions.

78.    NAAA has enforced the Physical Auction Requirement discriminatorily to preclude membership to certain digital-only platforms like ACV, which pose an existential competitive threat to NAAA's controlling members, while at the same time allowing online platforms that Defendants do not consider to be competitive threats to persist.  For example, Defendants Manheim and ADESA are members of NAAA, yet they have digital marketplaces and conduct online auctions as well as Physical Auctions.

79.    NAAA's membership rules, as enforced through Defendants' control over the NAAA membership process, erect an unnecessary and insurmountable barrier to entry against digital-only auctions that pose a competitive threat to Defendants.

80.    NAAA's refusal to allow ACV to become a NAAA member is contrary to NAAA's independent business interests because it deprives NAAA of membership dues.  Those are a substantial source of revenue for NAAA, and it is estimated they receive approximately $1.4 million in revenue per year from all members.  Additionally, denying ACV's membership to

NAAA is contrary to NAAA's mission statement and serves no legitimate business justification.

The only apparent purpose is to prevent ACV from competing with NAAA members in the long

term.

**B.  AASC Denies AutoIMS Access to ACV**

81.     In addition to gaining access to AutoIMS through NAAA membership, any entity

can request a license to AutoIMS directly from AASC.  There is no formal application process for

AutoIMS access from AASC.  Upon information and belief, AASC's Board (i.e., representatives

from Manheim, ServNet, IAG, and, until recently, ADESA—all of whom are horizontal

competitors) must vote to approve a request for an AutoIMS license.

82.     On July 5, 2019, ACV made a formal written request to AASC to license AutoIMS.

Greg Lubrani, ACV's Vice President of Strategic Initiatives, emailed Venkat Krishnamoorthy,

AASC President and CEO, stating the following:

> Thanks for taking the time the other day to discuss the important
> matter of ACV Auctions gaining access to AutoIMS.  Although you
> expressed skepticism about ACV's chances of being approved as a
> client of AutoIMS, ***we would still appreciate the opportunity to be
> considered by the ownership group.  This is a formal request for
> ACV Auctions to be approved promptly as an AutoIMS client on
> commercially reasonable terms***.
>
> As we both know, the wholesale used car world is changing.  The
> consignors want to work with online auction platforms like ACV.
> Moreover, it is only fair for ACV and other platforms to have a
> chance to serve the consignors that use AutoIMS.  Hopefully, Auto
> Auction Services will do the right thing and open the doors to
> platforms like ACV.
>
> If there is any additional information you need from ACV in order
> to submit this request, please do not hesitate to contact me.  I
> appreciate your prompt attention to this matter.

83.     On July 15, 2019, Venkat Krishnamoorthy, acting in his capacity of AASC's

President and CEO, responded to ACV's request.  Krishnamoorthy stated that he presented ACV's

application to AASC's Board of Directors and that the Board was "***unanimous in its decision*** that

ACV's business model is not a fit for AASC's charter.  AASC is officially unable to satisfy ACV's request."

84.     Again, AASC's Board of Directors at the time was comprised solely of representatives from the Defendants, which would directly compete with ACV to provide Auction Services.  AASC's decision to deny ACV access to AutoIMS was part of an agreement between horizontal competitors to insulate themselves from disruptive competition.

85.     AASC's refusal to provide AutoIMS access to ACV is contrary to AASC's independent business interests and has no legitimate business justification.

86.     Denying ACV a license for AutoIMS denies AASC the revenue it would receive from ACV for the purchase of the license.  In return for using AutoIMS, licensees are required to remit to AASC various license, usage, and maintenance fees.  Thus, AASC's refusal to license AutoIMS to ACV sacrifices short-term profits to insulate Defendants Manheim, ADESA, and the independent auction members of ServNet/IAG from long-term competition.

87.     Denying a license to ACV also limits AASC's revenue in another way.  AASC includes in its licenses a fee that is calculated on a per-car-sold basis.  By denying ACV a license, AASC thus misses out on earning fees on the auction transactions that ACV would engage in if it had an AutoIMS license.

88.     The reasons AASC provided for denying access—such as ACV "not being a fit for AASC's charter" or ACV not owning a Physical Auction—are pretextual.  This is particularly so considering AASC's owners' increased use of digital auctions and digital auction solutions (described further below).

89.     AASC has excluded ACV from accessing AutoIMS because AASC is owned and controlled by direct horizontal competitors to ACV, including Manheim, ServNet, IAG, and, until recently, ADESA.  Manheim and ADESA alone control roughly 40 percent of Physical Auction

sites and provide approximately 70.3 percent of wholesale vehicle Auction Services.  Adding in the independent auctions that comprise the membership of ServNet and IAG, Defendants and their members represent almost the entirety—approximately 97 percent—of Physical Auction sites.

90.    These horizontal competitors have exercised control over AASC as Owners and/or Board members and acted against AASC's interest in order to benefit Defendants and their members instead.

### C.  Other Recent Acts in Furtherance of Defendants' Conspiracy

91.    In July 2021, relying on AASC's statements and on NAAA's representation that ACV had been denied membership because it lacked a Physical Auction, ACV purchased a 49 percent interest in Central Auto Auction ("CAA").  CAA is a Physical Auction, located in Connecticut, that had access to AutoIMS since 2009 by virtue of its membership in NAAA.

92.    On October 28, 2021, after learning that ACV had become a 49 percent owner of CAA, Defendant NAAA, at the direction of its leadership (which, again, includes representatives of Manheim, ADESA, and the members of ServNet and IAG), suspended CAA's membership in NAAA.  Although ACV requested to meet with NAAA President Charles Nichols regarding CAA's suspension, Mr. Nichols declined.  The only stated reason for the suspension was CAA's affiliation with ACV.

93.    On November 11, 2021, CAA responded in writing to NAAA, stating that "nothing in the Bylaws of NAAA precludes another investor having a 49% ownership interest in an NAAA member."  CAA informed NAAA that the reasons for the suspension were a pretext and requested NAAA to preserve, among other things, all documents related to the suspension.

94.    NAAA withdrew CAA's suspension on December 16, 2021.  In doing so, however, it warned CAA that NAAA "remains concerned about CAA's recent affiliation with ACV" and

stated that it would review CAA's membership status if, and when, ACV acquires a majority interest in CAA or there is a change in management at CAA.

95.     Defendants' message to ACV was clear—if it tried later to acquire a majority interest in a Physical Auction in order to obtain the benefits of an AutoIMS license, that auction's NAAA membership and AutoIMS license would be terminated.    Meanwhile, Defendants simultaneously operate physical and online auction sites.

96.     NAAA's refusal to admit ACV to its membership, as well as NAAA's implied refusal to allow ACV membership through acquisition of an interest in a Physical Auction, is the result of an illegal horizontal group boycott.

### D.  Defendants' Pattern of Exclusionary Conduct

97.     This is not the first time Defendants have been called to account for group boycott conduct based on their control of AASC and their refusal to license AutoIMS on fair and nondiscriminatory terms.  ACV's experience echoes the prior experience of a different entity seeking to offer Auction Services to Commercial Consignors.

98.     In July 2009, Copart, Inc. ("Copart"), a leading provider of salvage Auction Services, sued AASC alleging a group boycott.  Copart began in the salvage auction industry and in 2004 had introduced its VB2 (Virtual Bidding - Second Generation) technology, eliminating the traditional live auction format at its facilities nationwide.  When Copart started offering "whole-car" auctions, it began competing with Manheim and ADESA.  Copart alleged that its efforts "to offer innovative, Internet-based Auction Services to vehicle sellers" were being thwarted by AASC's refusal "to allow Copart access to an essential electronic network called AutoIMS."

99.     Copart alleged that AASC offered inflated and discriminatory fees to Copart and explained that "an officer of one of the vehicle auction companies which owns and controls AutoIMS informed an industry executive that AutoIMS was designed to be a 'moat around our

castle' to prevent new competitors, such as Copart, from effectively providing vehicle Auction Services to fleets and finance companies."

100.    Like ACV, Copart had been denied membership in NAAA.  Copart also alleged that "NAAA's membership criteria are purposefully employed to thwart competition and stifle innovation" and that Copart could not access AutoIMS through membership in NAAA.

101.    Following the suit, on August 18, 2009, AASC issued a press release announcing that Copart, Inc., and AASC "have reached an agreement that enables Copart to use AASC's Automotive Inventory Management System (AutoIMS)."  Under the agreement, AASC licensed AutoIMS to Copart and Copart became able "to receive vehicle assignments through AutoIMS," including from "commercial vehicle sellers such as banks, finance companies, credit unions and fleet operators."

102.    As of that time, AutoIMS connected "data from more than 450 auctions to the databases of over 1,300 commercial clients."  AASC recognized that Copart sold vehicles "using its patented, state-of-the-art VB2 technology which breaks down geographical barriers by allowing buyers to bid in a virtual-auction format online."  Today, Copart's many locations are listed as AASC auctions, and Copart is listed as a member of NAAA despite being a digital platform.

**V.    Defendants Build Online Commercial Auction Capabilities While Denying ACV AutoIMS Access**

103.    At or around the same time that Defendants conspired to deny ACV access to AutoIMS, thus preventing ACV from competing for Commercial Consignors that require Auction Service platforms to be integrated with inventory management software like AutoIMS, Defendants were developing their own online platforms to compete against ACV.

104.    Defendants were slow to realize the outdated nature of the Physical Auction model, and so online providers were able to find success in providing Auction Services to at least some

auction sellers.  Although Commercial Consignors are inextricably tied to Defendants for their Auction Service needs—by virtue of Commercial Consignors requiring AutoIMS integration—used car dealers and other sellers that do not require AutoIMS were willing to give online providers a chance.  Increasing competition from online providers for dealership sellers caused Defendants to realize the demand for online platforms.  Defendants Manheim and ADESA both began to offer online platforms in addition to their Physical Auctions.

105.    In 2018, Manheim launched the Manheim Express App and the Online Vehicle Exchange ("OVE").  Although Manheim previously offered Simulcast—which extended the Physical Auction experience through video and audio streaming of a live auction—Manheim Express and OVE were Manheim's first purely digital offerings.  Manheim Express and OVE offered online bidding, copying ACV's digital platform.  Most recently, in April 2022, Manheim's parent company launched Upside Direct, a digital store on the Manheim Marketplace that expands Manheim's online marketplace and mirrors other online Auction Service provider platforms with its pricing guarantee and instant cash offer.  These digital offerings have not impacted Manheim's NAAA membership or its AutoIMS license, showing NAAA's discriminatory application of its bylaws.  Furthermore, upon information and belief, Manheim's digital offerings benefit from Manheim's AutoIMS license, which therefore gives Manheim's online platforms like OVE a competitive advantage over digital platforms like ACV that have been foreclosed from accessing AutoIMS.

106.    Similarly, ADESA launched ADESA.com as an extension of ADESA's Physical Auctions.  ADESA.com offered vehicle inventory at all ADESA U.S. auction locations as well as upstream and off-lease inventory available from off-site locations.  ADESA.com permitted real-time online auctions of ADESA's on-premises inventory.  ADESA has Simulcast, which provides

livestream audio and video of a physical auction.  As of April 2020, more than 40 ADESA locations across the United States and Canada were running on Simulcast-only sales.

107.   ADESA also owns at least three online platforms acquired via acquisitions, including TradeRev App (2017), BacklotCars, Inc. (2020) and Carwave Holdings LLC (2021). These acquisitions have expanded ADESA's digital business to include a real-time digital auction similar to ACV's digital platform.  However, these online platforms have not impacted ADESA's NAAA membership or its AutoIMS license.  For example, ADESA.com is listed as one of the AutoIMS Auctions on the AutoIMS website maintained by AASC.  Upon information and belief, ADESA's digital offerings benefit from ADESA's AutoIMS license.

108.   The emerging shift to digital online platforms and the importance of digital auctions have also been recognized and publicly acknowledged by Defendants.  For example:

   a.   In May 2019, ServNet's then-CEO explained that a key challenge facing the wholesale sector is "the digital transformation."  He noted that while Manheim and ADESA were its members' primary competitors, "independent auctions are also keeping an eye on 'disrupters' such as online auction ACV Auctions.  The brick-and-mortar auctions are not putting their head in the sand about technology…. [I]t's no longer physical or digital, [i]t's brick-and-mortar and digital.  Every auction in the country, if you're going to be viable, if you're going to play on a big scale, you've got to be able to have those technologies."

   b.   In June and October 2019, respectively, Manheim executives noted: "Bringing the excitement of the auction to clients in a live, all-digital format is a key move in our broader digital strategy," and that "We don't think of it as digital or physical," "It's the digitization of the auction."

c.      And in March 2020, National Auto Auction Association's then CEO Frank Hackett said he saw more independent auctions ramping up digital, commenting "I think you'll find that as many independents that can go virtual will make that attempt."

109.    Further, due to limitations imposed by the Covid-19 pandemic, use of digital auctions and digital auction solutions in 2020 and 2021 has significantly increased.  Indeed, on October 20, 2020, ServNet said the auction industry has "survived" the Covid-19 pandemic "because vehicles could be bought and sold at auction online."  Specifically, "[t]he *ability to offer vehicles for sale to a remote audience has become a regular part of the auction experience*[.]"

110.    Despite these changes, Defendants, through their control of NAAA and AASC, have denied ACV access to AutoIMS based upon ACV's online-only auction format while, on information and belief, simultaneously using AutoIMS to benefit their own online auction operations.

## RELEVANT MARKETS

### I.      Wholesale Auction Services

111.    ACV and Defendants both offer Auction Services that facilitate wholesale used vehicle transactions.  They serve to match sellers of wholesale used vehicle inventory with buyers of that used vehicle inventory.  There are two antitrust markets in which ACV and Defendants compete to provide these Auction Services to wholesale used vehicle sellers:  (1) the market for Auction Services, generally, and (2) the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  This action is directed towards Defendants' collective—and to date, successful—attempts to exclude ACV from the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

**A.  General Market for Auction Services**

112.    The general market for Auction Services is comprised of auction platforms.  These companies conduct physical onsite auctions and/or operate online marketplaces that bring together buyers and sellers of wholesale used vehicles.  Today, due to digital marketplaces like ACV, the geographic scope of the market is becoming increasingly national.  There is robust competition in the general market, at least for the business of wholesale sellers who conduct relatively few auction transactions and thus have less of a need for a Standardized Vehicle Inventory Management System.  Auction Service providers do not need access to any particular inventory management system in order to effectively compete for those wholesale sellers' business.

**B.  Market for Auction Services Integrated with a Standardized Vehicle Inventory Management System**

113.    Defendants' conspiracy is directed towards the separate market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  Some, but not all, companies that provide Auction Services provide Auction Services Integrated with a Standardized Vehicle Inventory Management System.

114.    As described in detail above, that distinct offering is required by many Commercial Consignors.  Most critically, that includes national fleet owners and/or operators (such as the federal government) and national finance companies (such as GM Financial Services Co. and CapitalOne Auto Finance).  These entities will consign their lease returned, repossessed, or retired fleet vehicles to auction hosts who will both (1) match these third-party sellers with third-party buyers, and (2) integrate that process with the Standardized Vehicle Inventory Management System on which they have come to depend.

115.    Many of these Commercial Consignors require Auction Service providers to have a platform that integrates with AutoIMS before the consignor will list a used vehicle for sale on

that platform.  Although these Commercial Consignors may treat Physical Auctions and other digital platforms as substitutes, they distinguish between Auction Services generally and those that integrate with a Standardized Vehicle Inventory Management System.  Indeed, the AutoIMS website makes the connection between AutoIMS and the provision of auction services explicit, directly linking to a number of Defendants' auctions.

116.    Commercial Consignors who have expressed interest in selling used vehicles using ACV's 20-minute live, online auction platform have not done so because of ACV's lack of access to AutoIMS.  This shows that Commercial Consignors view Auction Services Integrated with a Standardized Vehicle Inventory Management System as distinct from Auction Services, more generally.  Auction Services without such integration simply cannot compete with Auction Services that are Integrated with a Standardized Vehicle Inventory Management System

117.    ACV's experience bears out that Commercial Consignors do not view unintegrated Auction Services as a meaningful substitute for such services that are integrated with a Standardized Vehicle Inventory Management System.  Moreover, Auction Service providers that are denied access to AutoIMS are unable to offer a competing Auction Service product, even if they were able to develop an alternative Standardized Vehicle Inventory Management System, because many Commercial Consignors require AutoIMS integration, specifically.  Indeed, Commercial Consignors are locked into using Auction Service providers whose platforms are integrated with AutoIMS precisely because of the high costs they would bear from switching to an alternative Standardized Vehicle Inventory Management System.

118.    The numbers likewise reflect that large Commercial Consignors would choose to utilize only those auctions that integrate with AutoIMS.  The vast majority of Commercial Consignors already utilize AutoIMS for other features of their business:  For example, in 2021, 78.6 percent of finance companies used AutoIMS to process new leases, and 64.6 percent of

finance companies used AutoIMS to process new loans.  Likewise, a significant percentage of Commercial Consignors utilize Auction Services provided by companies, like Defendants, with access to AutoIMS.  In fact, as explained further below, ACV has already heard from companies that they would not use Auction Services that were not integrated with AutoIMS.

119.    Lack of access to AutoIMS is the only barrier keeping ACV and other digital auction providers from competing in, and bringing additional competition to, the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

120.    Due to the nationwide scope of operations for most Commercial Consigners, the relevant geographic market for this market is the entire United States.

121.    As discussed above, Defendants Manheim, ADESA, ServNet, and IAG have market power in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  And that market power is protected by an absolute barrier to entry—access to AutoIMS.

## II.    Standardized Vehicle Inventory Management Systems Market

122.    Separate from the market for Auction Services, there is a market for Standardized Vehicle Inventory Management Systems.  This market consists of software that enables Commercial Consignors to assign vehicles to auctions for resale and to transmit and exchange data relating to those transactions.

123.    Despite the existence of other vehicle inventory management system software, most all Commercial Consignors use only one system to interface with auction hosts and manage their inventory—AutoIMS.

124.    Commercial Consignors adopted AutoIMS only after receiving promises by Defendants that AutoIMS would be a "nonproprietary Internet system for use by the ***entire auction industry***."  If Commercial Consignors knew that some Auction Service providers would be denied

an AutoIMS license, Commercial Consignors might have been hesitant to commit to a single inventory management system.

125.    But now, Commercial Consignors are locked into AutoIMS because it would take significant time and money to adopt or replace AutoIMS with any other Standardized Vehicle Inventory Management System.  Due to network effects resulting from Defendants' conspiracy, AutoIMS has monopoly power in the market for Standardized Vehicle Inventory Management Systems.  Defendants' conspiracy has had the effect of functionally eliminating any alternative Standardized Vehicle Inventory Management Systems software that Commercial Consignors could utilize when selling their used vehicles at auction.

126.    Due to the nationwide geographic scope of the Standardized Vehicle Inventory Management Systems, the relevant geographic market is also the United States.

127.    AASC developed, owns, and controls AutoIMS.  Defendants Manheim, ServNet, IAG, and, until recently, ADESA owned and controlled AASC.  By virtue of this ownership and control, AASC has market power in the market for Standardized Vehicle Inventory Management Systems.

### THE DEFENDANTS' ANTICOMPETITIVE ACTIONS CAUSED ACV TO SUFFER ANTITRUST INJURY

128.    Defendants' exclusionary conduct has harmed ACV for the same reason it has harmed competition:  It has precluded innovative competition—specifically ACV's entry—into the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  When ACV has approached Commercial Consignors to use ACV's digital marketplace, Commercial Consignors have reacted positively to the ACV platform's ease of use and prospects of reduced costs.  However, as discussed above, one sticking point quickly and repeatedly emerged—the ability of ACV's platform to interoperate with AutoIMS.  Commercial Consignors

have repeatedly told ACV that they are unable to work with ACV because they use AutoIMS for inventory management and ACV does not have access to AutoIMS.

129.    For example, in 2018, ACV reached out to Hyundai Capital's (HCA) Director of Lease End Servicing about using ACV's digital marketplace.  In those discussions, HCA told ACV that HCA uses AutoIMS and refused to work with ACV because ACV did not have AutoIMS.  HCA explained that it was not willing to break its process and create manual work-arounds in order to do business with ACV.  HCA encouraged ACV to come back once they have access to AutoIMS.  In effect, ACV lost access to the wholesale auction sales that might come from one of the largest providers of new leases because it did not have access to AutoIMS.

130.    In addition, a Commercial Consignor terminated its contract with ACV because ACV did not have access to AutoIMS.  In November 2019, ACV entered into an agreement with Santander Consumer USA regarding Chrysler vehicles.  However, less than a year into the contract, Santander's Senior Director of Vehicle Remarketing advised ACV that because ACV did not have access to AutoIMS, Santander had to break its process and workflow in order to send business to ACV (outside of AutoIMS) and it could not do it anymore.  Santander told ACV that it was spending more time to manually process a handful of cars with ACV than it was on all of its other inventory.  In October 2020, Santander terminated its agreement with ACV.  As a result, ACV lost the opportunity to provide Auction Services for another major provider of new leases because it did not have access to AutoIMS.

131.    Furthermore, the lack of AutoIMS has impacted other opportunities.  For example, in April 2022, ACV met with GM Financial, the second-largest provider of new leases.  At that meeting, GM Financial's first question was whether ACV was integrated with AutoIMS.  ACV has had similar discussions with partners, like US Bank, who are only willing to partner with ACV for inspection services because ACV doesn't have AutoIMS.

132.    More importantly, ACV's foreclosure has harmed Commercial Consignors and dealer purchasers as well as the ultimate individual retail purchasers of the vehicles through a Commercial Consignors auction.  By precluding competition from ACV, Defendants Manheim, ADESA, and the members of ServNet/IAG can charge supracompetitive Auction Service fees to both sellers and purchasers of used commercial consignment vehicles, and those higher prices will constrain output in terms of the number of auction sales that might occur.  Because there is limited competition among Defendants due to regional and geographic constraints, there are few checks on the high prices and supracompetitive Auction Service fees that Defendants charge.  Quality likewise has been reduced, because the most innovative Auction Services providers are being kept out of the relevant market.  What is more, dealers who otherwise use ACV's platform to **purchase** used vehicles are prevented from seeing (and bidding on) the used vehicles that would be offered by Commercial Consignors.

133.    Defendants' anticompetitive exclusion of ACV was intended to, and has had the effect of, preventing innovative competition in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

134.    More fundamentally, the direct injury here is not limited to ACV.  Defendants' illegal, exclusionary, and anticompetitive conduct harms all innovative and disruptive digital-only Auction Services.   Specifically, Defendants' agreement to deny ACV and other online-only vehicle auction sites from accessing AutoIMS prevents those companies from:

      a.   Entering the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System, thereby limiting output in that market;

      b.   Enjoying increased efficiencies in digital-only operations which would lead to reduced costs and fees;

    c.   Providing a higher quality auction experience to used vehicle buyers and sellers;

    d.   Offering more transparent and honest services to used vehicle buyers and sellers; and

    e.   Realizing increased economies of scale which lead to lower consumer prices.

135.    The foregoing acts have harmed ACV, consumers, and competition by limiting competition for Auction Services Integrated with a Standardized Vehicle Inventory Management System, imposing higher auction fees charged to Commercial Consignors, limiting used vehicle buyers' choice and availability of used vehicles, stifling innovation, raising transaction costs to both Commercial Consignors and buyers of wholesale used vehicles, and artificially maintaining auction fees for Physical Auctions above what would exist but for the anticompetitive conduct alleged herein.

136.    The ultimate victims of Defendants' illegal conspiracy are retail purchasers of used vehicles. Due to competition between used car dealerships, much of the savings resulting from ACV's disruptive business model (described above) would be passed along to consumers in the form of lower prices. But Defendants' illegal conduct to protect their outdated business models has prevented retail consumers from realizing those savings.

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants)**

**Unlawful Group Boycott Violating Sherman Act § 1 *per se***

137.    Plaintiff ACV incorporates by reference each preceding allegation and assertion above as though alleged herein.

138.    Defendants Manheim, ADESA, ServNet, and IAG—working in concert with each other and with and through Defendants NAAA and AASC—agreed and conspired to boycott ACV by denying access to AutoIMS.  AutoIMS is the industry-standard inventory-management system required to compete effectively in that market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

139.    Defendants Manheim and ADESA, and members of Defendants ServNet and IAG, are all horizontal competitors in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

140.    Defendants Manheim, ADESA, ServNet, and IAG have substantial market power in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

141.    Defendant NAAA, which is jointly controlled by Defendants Manheim, ADESA, ServNet, and IAG, denied ACV's request for membership—and thus access to AutoIMS—to protect the market power of Manheim, ADESA, and other independent auctions in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

142.    Likewise, Defendant AASC, which was, at the time, jointly controlled by Defendants Manheim, ADESA, ServNet, and IAG, denied ACV's request for a direct AutoIMS license to protect the market power of Manheim, ADESA, and other independent auctions in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

143.    The Defendants' unlawful conspiracy as set forth above constitutes a group boycott of Plaintiff ACV in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System and is a ***per se*** violation of Section 1 of the Sherman Act. Defendants are a group of horizontal competitors that have used their dominant market power to

deny a competitor at their same level (ACV) access to a feature necessary to compete effectively for the Auction Services demanded by Commercial Consignors.  And there can be no claim by Defendants that this exclusionary practice—which serves only to keep out a competitor whose presence in the marketplace would improve the quality and price of Auction Services—in any way enhances efficiency or competition in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

144.    Plaintiff ACV has suffered injury to its business and property because of Defendants' unlawful conduct.

145.    ACV has suffered antitrust injury because of Defendants' unlawful boycott. Defendants' boycott has precluded ACV from competing in and bringing innovation to the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  This preclusion has harmed ACV for the same reason that it harms competition—reduced innovation in the market.  In sum, Plaintiff's injuries are the type that antitrust laws were intended to prevent.

## COUNT II

### (Against All Defendants)

### Unlawful Group Boycott Violating Sherman Act § 1 Under the Rule of Reason

(Pled in the Alternative to Count I)

146.    Plaintiff ACV incorporates by reference each and every allegation set forth above as though fully set forth herein.

147.    Defendants' conspiracy to engage in a horizontal group boycott of Plaintiff ACV in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System also violates Section 1 of the Sherman Act under the Rule of Reason.

148.    Defendants' boycott of ACV has adversely affected the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  Defendants'

actions have harmed both sellers of wholesale used vehicles and buyers of wholesale used vehicles, who, as a result of Defendants' conduct, must choose among an artificially constrained set of Auction Service providers, pay more for those services, and experience worse service.  In other words, buyers and sellers experience reduced output, higher prices, and lower quality.

149.    In this way, Defendants have exercised their considerable market power in the market for Auction Services Integrated with a Standardized Inventory Management System in a way that has harmed competition.  By foreclosing ACV from accessing AutoIMS and thus being able to compete effectively in the relevant market, Defendants have exercised market power to reduce output, raise prices, and impede innovation.  As a result, Commercial Consignors and buyers are paying higher fees and enduring worse service than otherwise would be the case, the costs for which are ultimately passed on to retail individual consumers.

150.    There is no procompetitive justification for either NAAA's denial of membership or AASC's refusal to license AutoIMS to Plaintiff ACV.  In fact, the denial of an AutoIMS license is against AASC's economic interests and is intended solely to stifle competition in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

151.    As a result of the unlawful conduct of Defendants, ACV has suffered injury to its business and property.

152.    ACV has suffered antitrust injury because ACV's injury flows from Defendants' conspiracy to exclude ACV from the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.  Consumers in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System have suffered from higher prices, the loss of innovation, and the decrease in output in the market.  These injuries are the type that antitrust laws were intended to prevent.

## COUNT III

**(Against Defendants AASC, Manheim, ADESA, ServNet, and IAG)**

**Conspiracy to Restrain Trade by Abusing Standard Setting in Violation of Sherman Act §1**

153.    Plaintiff ACV incorporates by reference each and every allegation set forth above as though fully set forth herein.

154.    Defendant AASC has functioned as a de facto consensus-oriented private standard-setting organization.  Under the direction of Defendants Manheim, ADESA, ServNet, and IAG, it developed AutoIMS to become the industry-standard Vehicle Inventory Management System software and a requirement for providing Auction Services Integrated with a Standardized Vehicle Inventory Management System.

155.    To induce Commercial Consignors to adopt AutoIMS and to discourage auctioneers from developing competing inventory management systems, AASC represented that it would have an open-licensing policy for AutoIMS.

156.    Upon information and belief, Commercial Consignors relied on those representations and did not develop a competing inventory management system.

157.    Upon information and belief, Commercial Consignors also relied on AASC's open-licensing promise to adopt AutoIMS.

158.    As a result of AASC's open-licensing promise and the market power of AASC's owners in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System, AutoIMS became the industry-standard Vehicle Inventory Management System software.  In 2021, for example, financial companies processed 79 percent of their lease transactions using AutoIMS and processed 64.6 percent of their loan transactions using AutoIMS. Those same consignors have also made clear that AutoIMS is a necessary input for auctioneers seeking to compete to provide Auction Services to those consignors.

159.    Notwithstanding its promise to openly license AutoIMS, AASC refused to license AutoIMS to ACV.  In doing so, AASC was acting at the direction of, and in conspiracy with, its owners to shield Manheim, ADESA, and the members of ServNet and IAG from ACV's innovative and potential disruptive competition in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System.

160.    AASC sacrificed short-term profits by refusing to license ACV, and the refusal was irrational but for the anticompetitive benefit to its owners, who recouped supracompetitive profits by keeping ACV out of the market.

161.    AASC's representations of an open licensing policy for AutoIMS were intentionally false.  Despite promoting AutoIMS as the "industry standard inventory management platform" that would "bring[] together the wholesale remarketing industry," AASC denies AutoIMS access to competitors it views as a threat.  Furthermore, ADESA's former CEO admitted that Defendants built AutoIMS to "preserve [their] collective business interest[s]."

162.    Defendant AASC and its Defendant Owners' failure to abide by their promise to license AutoIMS to ACV and other digital platforms for use in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System violates Section 1 of the Sherman Act under the Rule of Reason.  By foreclosing ACV from accessing AutoIMS and thus from being able to compete effectively in the relevant market, Defendants have reduced output and impeded innovation.  As a result, consignors and buyers are paying higher fees and enduring worse service than otherwise would be the case, the costs for which are ultimately passed on to retail individual consumers.

163.    There is no procompetitive justification for AASC's refusal to license AutoIMS to Plaintiff ACV.

164.     As a result of the unlawful conduct of Defendants AASC, Manheim, ADESA, ServNet, and IAG, Plaintiff ACV has suffered injury to its business and property.

165.     ACV has suffered antitrust injury because ACV's injury flows from the harms to the competitive process that emerged from a conspiracy to misuse industry-standard setting to impede innovation.  Both ACV and consumers in the market for Auction Services Integrated with a Standardized Vehicle Inventory Management System have suffered from the loss of innovation and the decrease in output in the market.  These injuries are the type that antitrust laws were intended to prevent.

<u>**COUNT IV**</u>

**(Against AASC)**

**Monopolization of the Standardized Vehicle Inventory Management Systems Market in Violation of Sherman Act §2**

166.     Plaintiff ACV incorporates by reference all allegations set forth above as though fully set forth herein.

167.     Defendant AASC has functioned as a private standard-setting organization, and it developed AutoIMS as an industry-standard Vehicle Inventory Management System software that has been adopted by most large consignors and is required by those consignors when they select an Auction Services provider.  As a result, AASC has monopoly power in the market for Standardized Vehicle Inventory Management Systems.

168.     The network effects that flow from AutoIMS's status as the industry-standard inventory management system for Commercial Consignors constitute a substantial barrier to entry into the market for Standardized Vehicle Inventory Management Systems.

169.   AASC willfully acquired and maintained its monopoly in the market for Standardized Vehicle Inventory Management Systems through exclusionary conduct with the specific intent of monopolizing that market.

170.   AASC engaged in exclusionary conduct by making knowingly false statements regarding AASC's willingness to openly license AutoIMS with the specific intent of monopolizing the market for Standardized Vehicle Inventory Management Systems.  In particular, Defendant AASC represented that it would have an open licensing policy for AutoIMS, describing AutoIMS as a "nonproprietary system for use by the entire auction industry."  That representation was intentionally false.

171.   Upon information and belief, Commercial Consignors relied on that false representation in adopting AutoIMS and foregoing investment in a competing inventory management system.

172.   As a result of the exclusionary conduct set forth above, AASC has maintained monopoly power in the market for Standardized Vehicle Inventory Management Systems with a market share of almost 100 percent.

173.   The conduct described above constitutes a monopolization of the market for Standardized Vehicle Inventory Management Systems in violation of Section 2 of the Sherman Act.

174.   As a result of AASC's unlawful conduct, Plaintiff ACV has suffered injury to its business and property.

175.   The harm ACV is suffering is antitrust injury because it flows from exclusionary conduct that impedes innovation and output in the market for Standardized Vehicle Inventory Management Systems.

## COUNT V

**(Against Manheim, ADESA, ServNet, IAG, and NAAA)**

**Conspiracy to Monopolize the Standardized Vehicle Inventory Management Systems Market in Violation of Sherman Act §2**

176.    Plaintiff ACV incorporates by reference each and every allegation set forth above as though fully set forth herein.

177.    Defendants Manheim, ADESA, ServNet, and IAG conspired to form AASC and develop AutoIMS with the specific intent of monopolizing the market for Standardized Vehicle Inventory Management Systems.

178.    In their own words, Defendants acknowledge that in forming AASC, they had a specific intent to identify "how our industry could work together to put a fence around our customers, preventing outside third parties from putting us out of business."  Defendants further state that AutoIMS was developed to "preserve our collective business interest…"

179.    In furtherance of their conspiracy to monopolize the market for Standardized Vehicle Inventory Management Systems, Defendants falsely marketed AutoIMS as a "nonproprietary system for use by the entire auction industry."

180.    In furtherance of their conspiracy to monopolize the market for Standardized Vehicle Inventory Management Systems, Defendants used Defendant NAAA as a vehicle to execute their false promise to license to the entire industry.  Despite representing that AutoIMS would be made broadly available as a benefit of NAAA membership, Defendants limited AutoIMS access only to Physical Auctions via NAAA's discriminatory membership limitations.

181.    Upon information and belief, Commercial Consignors relied on Defendants' false representation in adopting AutoIMS and foregoing investment in a competing inventory management system.

182.     Since forming AASC and developing AutoIMS, Defendants Manheim, ADESA, ServNet, and IAG have conspired to effectuate AASC's illegal monopolization of the market for Standardized Vehicle Inventory Management Systems.

183.     As a result of the unlawful conduct of Defendants Manheim, ADESA, ServNet, IAG, and NAAA, Plaintiff ACV has suffered injury to its business and property.

184.     ACV has suffered antitrust injury because ACV's injury flows from the harms to the competitive process that emerged from a conspiracy to monopolize the market for Standardized Vehicle Inventory Management Systems.

## COUNT VI

### (Against All Defendants)

### Conspiracy to Unreasonably Restrain Trade in Violation of the Donnelly Act
### (N.Y. Gen. Bus. Law § 340(1)).

185.     Plaintiff ACV incorporates by reference each and every allegation set forth above as though fully set forth herein.

186.     Defendants transact business in New York and operate and support member auctions in New York.

187.     Defendants engaged in a pattern of conduct of unfair and unlawful business practices—namely a group boycott of ACV, abuse of standard setting, and monopolization—in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and of the Donnelly Act (N.Y. Gen. Bus. Law § 340(1)).

188.     Through that pattern of unfair and anticompetitive conduct, Defendants improperly acquired increased profits and caused actual injury to ACV.

189.     Plaintiff ACV has suffered injury to its business and property because of Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, ACV prays that this court:

1) Adjudge and decree that Defendants' conduct is unlawful and in violation of the Sherman Act and the Donnelly Act;

2) Permanently enjoin and restrain Defendants, their subsidiaries, parents, affiliates, officers, directors, partners, agents, employees, and all other representatives acting on their behalf, from committing, continuing, or maintaining such violations of the antitrust laws;

3) Order mandatory injunctive relief compelling NAAA to grant ACV membership, with full access to all benefits resulting from that status;

4) Order mandatory injunctive relief compelling AASC to license AutoIMS to ACV on fair, reasonable, and nondiscriminatory terms;

5) Award ACV treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), including, without limitation, Plaintiff's attorneys' fees;

6) Award ACV such other relief as is necessary to or appropriate to restore and maintain competitive conditions in the markets affected by Defendants' unlawful conduct;

7) Award ACV all costs, interest (including pre-judgment and post-judgment interest), and expenses to which they are legally entitled; and

8) Grant such other and further relief as the Court deems just, necessary, and proper.

## JURY DEMAND

ACV hereby demands a trial by jury on those claims triable by jury.

Dated:  August 26, 2022

Respectfully submitted,

OCTILLO PLLC


/s/ Myriah Jaworski

Myriah Jaworski
Chirag H. Patel (*pro hac vice* pending)
Liberty Building,
420 Main St., Suite 1110
Buffalo, New York 14202
(716) 725-2609
mjaworski@octillolaw.com
cpatel@octillolaw.com

ORRICK, HERRINGTON & SUTCLIFFE


/s/ John (Jay) Jurata, Jr.

John (Jay) Jurata, Jr. (*pro hac vice* pending)
Eileen M. Cole (*pro hac vice* pending)
Benjamin Chagnon (*pro hac vice* pending)
Christie Boyden (*pro hac vice* pending)
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706
(202) 339-8400
jjurata@orrick.com
eileen.cole@orrick.com
bchagnon@orrick.com
cboyden@orrick.com

*Counsel for Plaintiff*
*ACV Auctions, Inc.*