# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACV Auctions, Inc., | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00649-GWC |
| National Auto Auction Association, Inc., Auto Auction Services Corporation, Manheim Auctions, Inc., ADESA US Auction, LLC, ADESA, Inc., ServNet Auction Group, and Independent Auto Auction Services Corporation, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(b)(6)

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

FACTS AS ALLEGED............................................................................................. 4

LEGAL STANDARD............................................................................................... 6

ARGUMENT ........................................................................................................... 7

      I.      ACV's Section 1 and Donnelly Act claims (Counts I–III and VI) fail because the allegations describe only lawful unilateral conduct, not concerted action. ............ 7

      II.    ACV fails to allege that any "agreement" to withhold AutoIMS from ACV is an unreasonable restraint of trade, defeating its Section 1 claims............................ 12

          A.     Count I fails because ACV's group boycott claim is not subject to *per se* treatment. ................................................................................................ 12

          B.     Count II fails because ACV has failed to allege that AASC's licensing decision and NAAA's membership decision are unlawful under the rule of reason. ................................................................................................... 15

      III.   ACV's claim that AASC and the Physical Auction Defendants violated Section 1 by conspiring to abuse a private standard setting organization fails as a matter of law................................................................................................................... 18

      IV.   ACV's Section 2 monopolization and conspiracy to monopolize claims (Counts IV & V) are not legally cognizable.................................................................... 21

          A.     ACV's Complaint lacks factual allegations of anticompetitive conduct under either a refusal-to-deal or false-marketing theory........................... 21

          B.     ACV's conspiracy to monopolize claim (Count V) likewise fails to state a claim.................................................................................................... 24

      V.    ACV's Section 1 and Section 2 claims fail because ACV has not pled the existence of a plausible relevant market or the existence of market power.......... 25

          A.     The identified markets for ACV's Section 1 and Section 2 claims are implausible and inadequately pled........................................................... 25

          B.     Having failed to adequately plead a relevant market, ACV fails to plead market power and monopoly power. ....................................................... 29

CONCLUSION....................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
   1 F.4th 102 (2d Cir. 2021) ...............................................................12, 16

*AD/SAT v. Associated Press,*
   181 F.3d 216 (2d Cir. 1999)........................................................8, 10, 26

*In re Adderall XR Antitrust Litig.,*
   754 F.3d 128 (2d Cir. 2014).............................................................22, 23

*All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund,*
   596 F. Supp. 2d 630 (E.D.N.Y. 2009) .................................................24

*American Needle v. NFL,*
   560 U.S. 183 (2010)........................................................................10, 11

*Apex Oil Co. v. DiMauro,*
   713 F. Supp. 587 (S.D.N.Y. 1989) ......................................................14

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.,*
   2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) .............................................16

*Arnold Chevrolet LLC v. Tribune Co.,*
   418 F. Supp. 2d 172 (E.D.N.Y. 2006) ...................................................8

*Arrington v. Burger King Worldwide, Inc.,*
   47 F.4th 1247 (11th Cir. 2022) ...........................................................11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..........................................................................1, 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983)..............................................................................6

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
   166 F. Supp. 3d 988 (N.D. Cal. 2015) ................................................18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..............................................................................6

*Bennett v. Cardinal Health Marmac Distribs.,*
   2003 WL 21738604 (E.D.N.Y. July 14, 2003) ....................................12

*Bilinski v. Keith Haring Found., Inc.*,
   96 F. Supp. 3d 35 (S.D.N.Y. 2015) ...................................................................19, 21

*Bogan v. Hodgkins*,
   166 F.3d 509 (2d Cir. 1999)......................................................................................12

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ..................................................................................16

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
   601 F.2d 48 (2d Cir. 1979).........................................................................................7

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993)................................................................................7, 16

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)......................................................................................26

*Cinema Vill. Cinemart v. Regal Ent. Grp.*,
   708 F. App'x 29 (2d Cir. 2017) .................................................................................26

*In re Circuit Breaker Litig.*,
   984 F. Supp. 1267 (C.D. Cal. 1997) .........................................................................19

*City of New York v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011)................................................................................26, 27

*Clorox Co. v. Sterling Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997)........................................................................................17

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
   2014 WL 1396524 (S.D.N.Y. Sept. 18, 2013).........................................8, 9, 10, 11

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016).................................................................................25, 26

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
   846 F.2d 284 (5th Cir. 1988) ....................................................................................20

*Cont'l T.V. v. GTE Sylvania*,
   433 U.S. 36 (1977)....................................................................................................21

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007).....................................................................................6, 22

*Eliason Corp. v. Nat'l Sanitation Found.*,
   614 F.2d 126 (6th Cir. 1980) ....................................................................................19

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
    386 F.3d 485 (2d Cir. 2004)..............................................................21

*Hassan v. Spicer*,
    2006 WL 228958 (E.D.N.Y. Jan. 31, 2006) ....................................20

*Hinds Cnty. v. Wachovia Bank N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010)................................................12

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)................................................15

*Invamed, Inc. v. Barr Labs., Inc.*,
    22 F. Supp. 2d 210 (S.D.N.Y. 1998)..............................................8, 10

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018)..................................................9

*Kasada, Inc. v. Access Cap., Inc.*,
    2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...................................17

*In re Keurig Green Mountain Singleserve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)...........................................23, 24

*Kramer v. Pollock-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ....................................................25

*Lai v. USB-Implementers F., Inc.*,
    2015 WL 12746705 (C.D. Cal. Mar. 11, 2015) ................................20

*Litovich v. Bank of Am. Corp.*,
    568 F. Supp. 3d 398 (S.D.N.Y. 2021)..................................................9

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014)...............................................................18

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)...............................................................12

*Mathias v. Daily News, LP*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)................................................27

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)...............................................................10

*In re Mexican Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)..........................................7, 8, 10

*Michael E. Jones. M.D., P.C. v. UnitedHealth Grp., Inc.*,
　2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020) .......................................................25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
　465 U.S. 752 (1984) ...........................................................................................9

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
　296 F. Supp. 3d 442 (E.D.N.Y. 2017) .................................................................9

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
　883 F.3d 32 (2d Cir. 2018).................................................................................16

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
　850 F.2d 904 (2d Cir. 1988)...............................................................................23

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
　707 F. Supp. 111 (E.D.N.Y. 1988) .....................................................................15

*Ochre LLC v. Rockwell Architecture Plan. & Design, PC*,
　2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) .......................................................11

*Otter Tail Power Co. v. United States*,
　410 U.S. 366 (1973)...........................................................................................22

*People v. Rattenni*,
　613 N.E.2d 155 (N.Y. 1993)................................................................................7

*Pepsico, Inc. v. Coca-Cola Co.*,
　315 F.3d 101 (2d Cir. 2002)...............................................................................25

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
　530 F. Supp. 3d 301 (S.D.N.Y. 2021)........................................................9, 13, 14

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
　801 F.3d 412 (4th Cir. 2015) .............................................................................18

*Singh v. Am. Racing-Tioga Downs, Inc.*,
　2021 WL 6125432 (S.D.N.Y. Dec. 28, 2021) ......................................................26

*Texaco Inc. v. Dagher*,
　547 U.S. 1 (2006).................................................................................8, 10, 11, 12

*Todd v. Exxon Corp.*,
　275 F.3d 191 (2d Cir. 2001)...............................................................................30

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
　142 F.3d 90 (2d Cir. 1998)..............................................................................7, 12

*Tunis Bros. Co. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1991) .................................................................28

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ..................................................................16

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ..............................................................................25

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) .................................................27

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .....................................................................2, 6, 21

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ....................................................................24

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch., Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) ...................................................17

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
   2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) .........................................28

*Worldhomecenter.com, Inc. v. KWC Am., Inc.*,
   2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011) .......................................13

## INTRODUCTION

The antitrust laws exist to promote, encourage, and protect competition—not to enable freeriding for the benefit of individual competitors. But that is precisely what Plaintiff ACV Auctions, Inc. ("ACV") seeks to achieve through this lawsuit. ACV boasts throughout its Complaint that it is "disrupt[ing] the traditional physical used vehicle auction model" and has "quickly" become "one of the leading digital used vehicle marketplaces." ECF No. 1 ("Compl.") ¶¶ 59, 64. With that success, ACV could invest in its own technology to compete for customers more effectively. Instead, ACV seeks to leverage the antitrust laws to gain unwarranted access to an investment made by its competitors more than twenty-five years ago. ACV's legal theories are antithetical to bedrock antitrust principles, and its antitrust claims fail as a matter of law.

In 1997, a group of automobile auction service providers (the "Physical Auction Defendants")[1] founded the joint venture Defendant Auto Auction Service Corporation ("AASC") to develop software to make it easier for entities with large vehicle fleets to sell their inventory at physical auctions. Before AASC, sellers had to use "different inventory management . . . systems to connect with each auction." Compl. ¶ 40.[2] To simplify that balkanized network, AASC created AutoIMS, a system that allows sellers to assign, track, and manage their inventory at physical

---

[1] AASC was founded by four entities: Manheim Auction Inc. ("Manheim"), ADESA, Inc. ("ADESA"), ServNet Auction Group ("ServNet"), and Independent Auto Auction Services Corporation ("IAASC"). *Id.* ¶¶ 20–25, 27. While Manheim provides and ADESA provided physical auction services, *id.* ¶¶ 20, 22, ServNet and IAASC are collectives of smaller, independent physical auction providers. *Id.* ¶¶ 24–25. The Complaint also names as a defendant ADESA US Auction LLC ("ADESA US") on the ground that ADESA US purchased the ADESA physical auction business earlier this year. *Id.* ¶ 4 n.1. While ADESA US was not one of AASC's founders and the Complaint acknowledges that ADESA US did not even exist at the time of the alleged conduct at issue (*id.*), for purposes of this brief only, Manheim, ADESA, ServNet, IAASC, and ADESA US are collectively referred to herein as "the Physical Auction Defendants."

[2] Defendants dispute many of the Complaint's alleged facts, but accept them as true for purposes of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

auctions scattered across the country. *Id.* ¶¶ 41–42. ACV, an *online-only* auction service founded in 2014 (*id.* ¶ 59), now seeks to freeride off Defendants' investment by demanding that AASC grant ACV's *online* platform access to the AutoIMS system developed for *physical* auctions.

ACV alleges that when it requested an AutoIMS license three years ago, AASC denied the request because "ACV's [online-only] business model is not a fit for AASC's charter." *Id.* ¶ 83. ACV also separately sought membership in the National Auto Auction Association ("NAAA"), a trade association for physical auction providers, on the mistaken belief that NAAA membership would "automatically qualify [it] for a license to AutoIMS." *Id.* ¶ 7.[3] NAAA likewise denied ACV's application because its bylaws require that all members maintain a physical auction. *Id.* ¶¶ 71–75. Nonetheless, in the four years since ACV applied for NAAA membership and the three years since it requested an AutoIMS license, ACV has maintained its business model and "found success" as "one of the leading digital marketplaces providing wholesale Auction Services." *Id.* ¶ 3. Now, ACV seeks forced access to AutoIMS through this lawsuit. *Id.* at 50. But such a remedy requires the Court to act as a central planner exercising judicial review over AASC's and NAAA's respective licensing and membership decisions, a practice the Supreme Court has vehemently denounced. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (criticizing "forced sharing" because it "requires antitrust courts to act as central planners, identifying the proper price . . . and other terms of dealing"). While this bedrock principle precludes ACV's sought-after remedy, other fatal defects independently bar each claim.

**ACV's conspiracy claims are implausible.** ACV cannot transform AASC's and NAAA's unilateral licensing and membership decisions into antitrust "conspiracy" claims aimed at the

---

[3] ACV has named NAAA as a defendant because it still believes (incorrectly) that NAAA membership would grant it AutoIMS access. NAAA joins this motion to dismiss and has also filed a separate motion to dismiss addressing the claims against it.

Physical Auction Defendants. ACV alleges in a conclusory fashion that those decisions were concerted action by the Physical Auction Defendants to protect their business model. Yet, aside from conclusory allegations that some of the Physical Auction Defendants "jointly control[]" AASC and NAAA (*id.* ¶¶ 141–42), the Complaint contains no *facts* plausibly suggesting that these decisions were the product of a conspiracy as opposed to lawful independent business decisions. Without concerted action, there can be no Section 1 conspiracy claim.

Even if ACV could allege that different economic actors conspired to refuse ACV access to AutoIMS, ACV fails to adequately allege that AASC's and NAAA's decisions were unreasonable restraints on trade subject to *per se* treatment under the antitrust laws. *Per se* treatment is disfavored and reserved only for conduct that lacks any competitive virtue. A legitimate joint venture's decision not to change its business model or reform its product to allow a competitor to freeride on its shareholders' investment is not unreasonable *per se*. Nor is a trade association's enforcement of longstanding membership requirements.

ACV's Section 1 claim for abuse of standard-setting fares no better. None of the Defendants is a standard-setting organization ("SSO") nor is AutoIMS an industry standard within the meaning of Section 1. ACV attempts to plead its way around these facts by characterizing AASC as a "de facto" SSO, but the Complaint's allegations confirm that the opposite is true: not all auction services and vehicle consignors use AutoIMS, and AutoIMS access is not necessary to participate successfully in the marketplace for wholesale vehicle auctions.

***AASC is not required to do business with ACV.*** ACV's monopolization claim fails because federal antitrust laws protect AASC's right not to do business with ACV. The only exception to that bedrock rule is when a business terminates a prior course of dealing. But ACV has never done business with AASC, so ACV cannot bring a refusal to deal claim.

*ACV fails to allege valid product or geographic markets.* Finally, ACV's Section 1 rule of reason and Section 2 monopolization claims require well-pled factual allegations of the relevant product and geographic markets. ACV's Complaint defines two purported "markets," but it fails to provide the basic facts required to allege them plausibly, and its conclusory statements relating to market definition are internally inconsistent.

ACV brought this suit for one reason: access to AutoIMS, a proprietary system created and developed by physical auctions for use in physical auctions. But ACV cannot cast the challenged conduct as an antitrust violation, no matter how many ways it dresses up the facts with conclusory antitrust jargon. ACV's antitrust claims should be dismissed.

## FACTS AS ALLEGED

Used car dealerships sell millions of cars to retail consumers every year. Compl. ¶ 28. Those dealerships purchase "much of" their inventory from wholesale sellers—both Commercial Consignors[4] and other dealerships—through auctions. *Id.* ¶ 29. Before the internet age, all of those cars were sold through physical auctions. *Id.* ¶ 31. Because Commercial Consignors "have large volumes of inventory spread throughout the country," they had to use different inventory management systems "to connect with each auction with whom they worked." *Id.* ¶ 40. That process was inefficient. In 1997, Manheim, ADESA, ServNet, and IAASC formed the joint venture AASC in hopes of alleviating those burdens. *Id.* ¶ 41. Using its founders' pooled resources, AASC developed AutoIMS, a single system that enables its users to manage their inventory at physical auctions sites scattered throughout the country. *Id.* ¶ 42. AASC was successful, and many Commercial Consignors adopted AutoIMS as their inventory management system. *Id.* ¶ 48.

---

[4] The Complaint defines "Commercial Consignors" as "large-scale consignors with significant vehicle fleets." *Id.* ¶ 2.

That said, not all wholesalers use AutoIMS. *Id.* ¶¶ 37, 112. Nor is AutoIMS the only inventory management system in existence. *Id.* ¶ 123. Many used car dealerships manage their auction inventory without AutoIMS. *Id.* ¶ 65. A significant portion of cars sold by Commercial Consignors are not sold through AutoIMS. *Id.* ¶ 37. Although many wholesalers saw the value in adopting AutoIMS to manage their vehicle fleets for sale at physical auctions (*id.* ¶¶ 37–38, 48), many others do not require their auction services to be integrated with AutoIMS. *Id.* ¶¶ 37, 65.

Over the last decade, the auto auction industry has diversified to include both physical and online auction services, such as ACV. *Id.* ¶¶ 32, 59. In June 2015, ACV launched its online auction platform, and it "quickly" became "one of the leading digital used vehicle marketplaces" and "currently facilitates the sale of approximately 20,000 used vehicles per month across 100 geographies." *Id.* ¶¶ 59–60, 64. ACV attributes its success to one "simple reason: ACV's innovative business model saves buyers and sellers a lot of money." *Id.* ¶ 64. Despite that, ACV alleges it "has been less successful with Commercial Consignors" that use AutoIMS because those wholesalers cannot "manage and monitor their inventory on the ACV platform." *Id.* ¶¶ 66–67.

ACV allegedly sought AutoIMS access in two ways. First, ACV claims that it applied for NAAA membership in late 2018 because it (incorrectly) believed that NAAA membership would "automatically qualify" it for an AutoIMS license. *Id.* ¶¶ 7, 74. NAAA denied ACV's application due to ACV's "failure to satisfy the Physical Auction Requirement" in NAAA's bylaws. *Id.* ¶ 74. Next, in July 2019, ACV asked AASC to grant it an AutoIMS license, but AASC denied its request because "ACV's [online-only] business model is not a fit for AASC's charter." *Id.* ¶¶ 82–83.[5]

---

[5] AASC's Board of Directors is "comprised solely of representatives from" defendants Manheim, ADESA Inc., ServNet, and IAASC. *Id.* ¶ 84.

ACV initially accepted that denial in stride and continued to compete successfully. *Id.* ¶¶ 3, 64. Now, more than three years later, ACV brings this suit seeking judicial review of AASC's and NAAA's licensing and membership decisions under state and federal antitrust laws.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For antitrust conspiracy claims, "it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Facts, not "labels and conclusions," are needed to state a plausible claim for relief; courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

District courts "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983). "[P]roceeding to antitrust discovery can be expensive," so "it is only by taking care to require allegations" with sufficient heft that courts can "avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success. *Twombly*, 550 U.S. at 558–59 (citation omitted). Courts must review antitrust claims carefully at the pleading stage because false condemnation of competitive conduct threatens to "chill the very conduct the antitrust laws are designed to protect." *Trinko*, 540 U.S. at 414. This careful scrutiny takes on greater importance when reviewing claims brought by competitors: "Courts must be on guard against efforts of plaintiffs to use the antitrust

laws to insulate themselves from . . . competition." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir. 1979).

## ARGUMENT

**I.     ACV's Section 1 and Donnelly Act claims (Counts I–III and VI) fail because the allegations describe only lawful unilateral conduct, not concerted action.**

To state a claim under Section 1, a plaintiff must allege "concerted action between at least two legally distinct economic entities." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95–96 (2d Cir. 1998). "Unilateral conduct on the part of a single . . . enterprise falls outside the purview" of Section 1. *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993). ACV's Section 1 and Donnelly Act[6] claims are predicated on two acts: AASC's decision to deny ACV an AutoIMS license and NAAA's decision to deny ACV membership (which ACV incorrectly alleges would have granted it access to AutoIMS). Compl. ¶¶ 7–8. Neither of those decisions qualifies as concerted action subject to Section 1 scrutiny, so Counts I–III and VI must be dismissed. *See In re Mexican Gov't Bonds Antitrust Litig.* ("*MGB*"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss.").

ACV's conspiracy claims lack specific factual allegations connecting the Physical Auction Defendants to AASC's and NAAA's licensing and membership decisions. ACV asserts that the Physical Auction Defendants "conspired to boycott ACV by denying access to AutoIMS." Compl. ¶ 138. But it was AASC alone that denied ACV's request for an AutoIMS license, and NAAA alone that denied ACV's membership application. *Id.* ¶¶ 141–42. ACV attempts to transform those

---

[6] The deficiencies in ACV's Sherman Act conspiracy claims (Counts I–III, V) apply equally to its claims of "conspiracy" under the Donnelly Act, New York's state analog to Section 1 of the Sherman Act (Count VI). *See People v. Rattenni*, 613 N.E.2d 155, 158 (N.Y. 1993) (noting that the Donnelly Act is construed in light of federal antitrust law).

unilateral decisions into concerted action by alleging that AASC and NAAA are "jointly controlled by" some of the Physical Auction Defendants. *Id.* But alleging a chain of ownership or control is not sufficient to state a conspiracy claim, even where the controlling entities have motive to deny the competitor access. *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 2014 WL 1396524, at *22–25 (S.D.N.Y. Sept. 18, 2013) (dismissing conspiracy claims because plaintiffs failed to allege that any of the defendants "individually . . . agreed to or participated in the conspiracy" and because plaintiffs' reliance on the "alleged chains of ownership" between defendants was not sufficient to show conspiracy between these "affiliated entities" even though they had "motivation" to exclude plaintiffs), *aff'd*, 817 F.3d 46 (2d Cir. 2016); *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 219–22 (S.D.N.Y. 1998) (dismissing "refusal to deal" claim because it alleged "nothing more than unilateral action by" the controlled entity since "the complaint contains . . . nothing to demonstrate that the [owners] were involved in [the controlled entity's] actions in any way"); *accord Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006).

That rule applies with equal force to allegations against joint ventures and trade associations. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) ("When 'persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market.'"); *accord AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). Without factual allegations plausibly suggesting that AASC's and NAAA's decisions were the product of an agreement with the Physical Auction Defendants, ACV's allegations amount to no more than impermissible group pleading. *See MGB*, 412 F. Supp. 3d at 389 (dismissing conspiracy claims as impermissible group pleading because plaintiffs "failed to articulate a link between" the conspiracy "and the specific defendants named in the complaint").

Nor is ACV's allegation that AASC's board is "comprised solely of representatives from the [Physical Auction] Defendants" sufficient to allege a conspiracy. Compl. ¶ 84. "Conduct that is engaged in by a company or joint venture in which certain Defendants were investors or held board positions is not parallel conduct. . . . It is the activity of a single joint venture." *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 419 (S.D.N.Y. 2021); *see also id.* at 436 ("[A]ctivity by board members within a lawful joint venture cannot be imputed against [an affiliated entity] as parallel conduct relevant to a per se Section 1 group boycott claim."); *Concord Assocs.*, 2014 WL 1396524, at *26–27 (concluding that allegations of "interlocking officers or directors" do not "suffice[]" to allege a conspiracy because "it is a well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership").[7] The fact that "overlapping board membership" may provide "an opportunity to conspire" is not sufficient to allege an actual conspiracy. *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 336 (S.D.N.Y. 2021); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 461 (E.D.N.Y. 2017) ("Plaintiff must provide evidence that there was an *agreement to agree* to vote a particular way, compromising each individual Board member's independence."). Instead, ACV must allege facts showing a "conscious commitment to a common scheme designed to" foreclose competition from online auctions. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). ACV offers nothing on that score.

---

[7] Courts that have reached different conclusions have done so only after concluding that the joint venture amounted to a "sham" or a "smokescreen" created only to facilitate illegal horizontal coordination. *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 326 (S.D.N.Y. 2018). ACV does not make any such allegation. Nor can it: the Complaint admits that AASC is a legitimate joint venture that was created to fulfill a procompetitive purpose. Compl. ¶¶ 40–42.

The same reasoning applies to ACV's allegations concerning NAAA. ACV's only basis for asserting that NAAA's denial of its request for membership is that the Physical Auction Defendants "control[]" NAAA. Compl. ¶¶ 72, 79, 141. Second Circuit law is clear that although trade associations are "frequently the object of antitrust scrutiny, every action by a trade association is not concerted action by the association's members." *AD/SAT*, 181 F.3d at 234. (citation omitted). It is not enough to allege that NAAA is controlled by the Physical Auction Defendants. Instead, it must allege facts "tending to show that association members, in their individual capacities, consciously committed themselves" to blocking ACV's membership. *Id.*

Once the conclusory allegations of conspiracy are stripped away, nothing is left to plausibly suggest that the Physical Auction Defendants conspired. ACV's conclusory allegations of an agreement are insufficient to survive a motion to dismiss. *See, e.g.*, *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135–36 (2d Cir. 2013) ("The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation."); *MGB*, 412 F. Supp. 3d at 388–91; *Concord Assocs.*, 2014 WL 1396524, at *22–27; *Invamed*, 22 F. Supp. 2d at 218–22.

ACV's attempt to recast AASC's unilateral licensing decision as concerted action also fails under Supreme Court precedent because the Physical Auction Defendants do not compete in the same market as AASC. The Court has addressed this issue in both *Dagher* and *American Needle v. NFL*, 560 U.S. 183 (2010). In *Dagher*, the Court found that a joint venture founded by two oil-and-gas competitors acted unilaterally in setting prices for gasoline sold in the Western United States. 547 U.S. at 5–6. Although the joint venture's founders were competing gasoline sellers, neither competed individually in the Western market; instead, they only "participated in [the relevant] market jointly through their investments." *Id.*

10

*American Needle* addressed a different situation where 32 NFL teams engaged in concerted action when they authorized a joint venture to grant an exclusive license covering all NFL teams' trademarks. 560 U.S. at 196–98. The court held that this joint licensing decision was concerted action because, independent of the joint venture, "the teams compete *in the market for intellectual property*." *Id.* at 197 (emphasis added). The Eleventh Circuit has recently explained that the inquiry under *American Needle* is not whether the participants in the joint venture compete generally, but whether they compete with respect to "the decision or decisions *in question*." *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1255 (11th Cir. 2022).

This case aligns with *Dagher*, although the facts are even more favorable to Defendants. Here, AutoIMS exists only through AASC. There are no allegations that any Physical Auction Defendant has ever sold, licensed, or competed in the market for inventory management systems. And no Physical Auction Defendant has any independent authority or power to license AutoIMS separate from AASC. As in *Dagher*, the Physical Auction Defendants participate in the market for inventory management systems only "jointly through their investments." 547 U.S. at 5–6. As a result, AASC's decisions about AutoIMS licenses can only be analyzed as unilateral conduct.

Finally, the antitrust claims against ADESA and ADESA US fail for another independent reason. ACV defines "ADESA" to include both ADESA, Inc. and ADESA US Auction, LLC— two distinct, unaffiliated entities, one of which (ADESA US) did not even exist at the time of the alleged conduct. Compl. ¶¶ 4 & n.1, 21–23. That is impermissible group pleading; ACV must separately allege each entity's involvement in the alleged conspiracy. *See Concord Assocs.*, 2014 WL 1396524, at *24 ("Group pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss."); *Ochre LLC v. Rockwell Architecture Plan. & Design, PC*, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) (a

complaint must "provide a plausible factual basis to distinguish the conduct of each of the defendants"); *Hinds Cnty. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (a plaintiff "must allege a factual connection between each Defendant and the alleged conspiracy"). ACV's failure to do so requires dismissal of the claims against both entities, and certainly the claims against ADESA US, which did not even exist at the time of the alleged conduct and thus could not have participated in any alleged conspiracy. Compl. ¶ 4 n.1.

## II.   ACV fails to allege that any "agreement" to withhold AutoIMS from ACV is an unreasonable restraint of trade, defeating its Section 1 claims.

Even if ACV had plausibly alleged concerted action, its Section 1 group boycott claims (Counts I and II) would still fail because it has not adequately alleged that AASC's and NAAA's licensing and membership decisions constitute "an unreasonable restraint of trade either *per se* or under the rule of reason." *Tops Mkts., Inc.*, 142 F.3d at 96.

### A.   Count I fails because ACV's group boycott claim is not subject to *per se* treatment.

Courts "presumptively appl[y] rule of reason analysis" rather than the *per se* rule in determining what conduct violates the antitrust laws. *Dagher*, 547 U.S. at 5; *accord 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 114 (2d Cir. 2021). The *per se* rule applies only to "manifestly anticompetitive" conduct. *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999) (citation omitted). It does not apply "where the economic and competitive effects of the challenged practice are unclear." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008). "The Supreme Court has warned against 'indiscriminately' expanding 'the category of restraints classed as group boycotts' . . . ." *Bogan*, 166 F.3d at 514 (citations omitted) (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458–59 (1986)); *see also Bennett v. Cardinal Health Marmac*

*Distribs.*, 2003 WL 21738604, at *4 (E.D.N.Y. July 14, 2003) ("[T]he mere allegation of a concerted refusal to deal does not justify . . . the *per se* rule.").[8]

It is especially rare for the *per se* standard to be applied to alleged group boycotts. In determining whether to do so, courts in the Second Circuit apply a stringent three-part test, examining whether (i) the alleged boycott has "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"; (ii) "the boycotting firms possess[] a dominant position in the relevant market"; and (iii) the challenged conduct is "justified by plausible arguments that [it was] intended to enhance overall efficiency and make markets more competitive." *PharmacyChecker.com*, 530 F. Supp. 3d at 344 (first alteration in original) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)). Here, each of these factors weigh against applying the *per se* rule.

First, ACV's own allegations confirm that AutoIMS is *not* essential to compete. The Complaint is replete with factual allegations about ACV's success in the auto auction space and the existence of alternative software besides AutoIMS:

- ACV was founded in December 2014 "to disrupt the traditional physical used vehicle auction model by introducing an innovative online-only marketplace for hosting used vehicle auctions." Compl. ¶ 59. It "launched its 20-minute online used vehicle marketplace in June 2015." *Id.* ¶ 60.

- ACV found immediate success because its "innovative business model saves buyers and sellers a lot of money." *Id.* ¶ 64. "ACV quickly grew to become one of the leading digital used vehicle marketplaces," and it "currently facilitates the sale of approximately 20,000 used vehicles per month across 100 geographies." *Id.*

- Today, ACV is "one of the leading digital marketplaces providing Auction Services" and "is transforming the wholesale used vehicle industry." *Id.* ¶¶ 1, 3.

---

[8] Most Donnelly Act claims are subject to the rule of reason, too. *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, 2011 WL 4352390, at *3 (S.D.N.Y. Sept. 15, 2011).

- ACV has been very successful with used car dealerships, *id.* ¶ 65, but it "has been less successful with Commercial Consignors." *Id.* ¶ 66.

- Not all Commercial Consignors use AutoIMS: ACV alleges that in 2021 alone, more than 20% of car leases and 35% of car loans were processed without AutoIMS. *Id.* ¶ 37.

- Other vehicle inventory management systems exist that ACV could use. *Id.* ¶ 123.

Although ACV would like AASC to provide AutoIMS to online-only auctions, its assertion that AutoIMS access is "necessary to compete" is implausible based on these facts. *Id.* ¶ 143.

Nor does ACV allege that Manheim's and ADESA's online auctions are fully integrated with AutoIMS. While ACV alleges that Manheim and ADESA[9] have online auctions in addition to their physical auction locations (*id.* ¶¶ 105–07), it avoids direct factual allegations that inventory sold through Manheim's and ADESA's online platforms is managed through AutoIMS. Instead, ACV alleges "upon information and belief" that Manheim's and ADESA's "digital offerings *benefit from* [their] AutoIMS license[s]" (*id.* ¶ 105 (emphasis added)), which is, at best, some nebulous suggestion that their online platforms gain some unspecified advantage because AutoIMS is available to their physical auctions. But that is not a factual allegation demonstrating that AutoIMS is necessary to compete. Without a plausible allegation that AutoIMS is essential, ACV's *per se* group boycott claim (Count I) must be dismissed. *See Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 598–99 (S.D.N.Y. 1989) (concluding that plaintiff failed to "overcome the presumption that a rule of reason analysis should be applied" because "[i]t is undisputed that [plaintiff] was able to enter the relevant market").

Second, ACV fails to provide the required factual allegations to plausibly allege that the boycotting firms have a "dominant position" in a relevant market. *PharmacyChecker.com*, 530 F.

---

[9] The Complaint does not specific whether this allegation refers to ADESA, Inc. or ADESA US.

Supp. 3d at 344. Indeed, as discussed in Section V below, ACV fails to provide any factual allegations to support its gerrymandered relevant product or geographic market definitions.

Finally, AASC's licensing decision and NAAA's membership decision are justified by plausible procompetitive benefits, foreclosing *per se* treatment. Courts apply the rule of reason to evaluate restraints imposed by joint ventures and trade associations because these organizations typically confer procompetitive benefits. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 467–68 (S.D.N.Y. 2017) (stating that plaintiffs cited no case "in which a decision by competitors . . . to direct the activities of . . . a legitimate joint venture[] has been evaluated under the *per se* standard"); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) ("[W]here professional or trade organizations are involved, courts have been reluctant to apply a *per se* analysis to such practices because the pro-competitive aspects of a trade organization may outweigh the negative consequences it has on competition.").

ACV expressly recognizes the procompetitive benefits of AASC's development of AutoIMS: it created efficiencies in the physical auction market for wholesale cars. Compl. ¶ 42. The challenged restraint (AASC's licensing decision) has a legitimate basis: "ACV's business model is not a fit for AASC's charter." *Id.* ¶ 83. The Complaint makes it clear why: AASC developed AutoIMS 25 years ago for use in the physical auction industry; ACV, on the other hand, is an online-only auction platform. Similarly, NAAA is a trade association that represents the physical auction industry; therefore, online-only auctions are ineligible for membership under NAAA's bylaws. *Id.* ¶ 70. Those legitimate justifications preclude *per se* treatment.

### B. Count II fails because ACV has failed to allege that AASC's licensing decision and NAAA's membership decision are unlawful under the rule of reason.

Recognizing that its *per se* claim (Count I) is destined to fail, ACV also attempts to plead a rule of reason claim (Count II). The rule of reason requires plaintiffs to demonstrate "that the

challenged action has had an actual adverse effect on competition as a whole in the relevant market." *1-800 Contacts, Inc.*, 1 F.4th at 114. Antitrust law protects the competitive process, not individual competitors. For that reason, allegations that a single *competitor* was harmed are insufficient to show an adverse effect on *competition*. *See Cap. Imaging Assocs.*, 996 F.2d at 543 (allegations that the plaintiff "has been harmed as an individual competitor will not suffice"); *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *5 (S.D.N.Y. Jan. 6, 2020) (dismissing antitrust claims because complaint "alleges harm to a competitor, not harm to competition—the *sine qua non* of an antitrust claim").

A plaintiff can show harm to competition in two ways. First, a plaintiff can provide direct evidence of an adverse effect on competition in the form of higher prices, reduced output, or decreased quality. *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018). Alternatively, a plaintiff can prove harm to competition indirectly by showing that defendants have market power and that "other grounds" exist to conclude that "the challenged restraint harms competition." *N. Am. Soccer League*, 883 F.3d at 42. Whichever path the plaintiff chooses, allegations of injury to competition must provide "supporting factual detail" rather than "merely recite the bare legal conclusion that competition has been restrained unreasonably." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (quoting *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507–08 (9th Cir. 1989)). ACV's allegations are entirely conclusory.

For its Section 1 claims, ACV alleges that the relevant product market is "Auction Services Integrated with a Standardized Vehicle Inventory Management System." Compl. ¶¶ 138, 147. The Complaint contains five paragraphs asserting boilerplate injury to competition in that market, but none contains a single *factual* allegation. *Id.* ¶¶ 132–36. ACV asserts that the Physical Auction

Defendants "*can* charge supracompetitive Auction Service fees," but it has not provided any factual support showing that they have done so in the past or are likely to do so in the future. *Id.* ¶ 132 (emphasis added). Indeed, the Complaint is utterly devoid of allegations as to any auction provider's prices. ACV further asserts that quality "has been reduced" because "innovative Auction Services providers are being kept out," but it provides no facts of diminished quality or a reduction in auction services. *Id.* The only facts alleged show the opposite: "In the last decade, the industry has started to change" because "[i]ndustry upstarts . . . have developed online platforms." *Id.* ¶ 32; *see also id.* ¶ 112 (stating that "robust competition" takes place in the market for auction services). ACV itself has found success with its "innovative business model" and is now "one of the leading digital marketplaces providing wholesale Auction Services." *Id.* ¶¶ 3, 64.

It is no surprise that ACV struggles to find facts to support any injury to competition—ACV's real complaint is that it cannot force AASC to change its business model to support ACV's online-only auction. But the antitrust laws were not designed to force companies to prop up competitors; they are meant only to prevent companies from committing acts that directly injure competition. *See Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir. 1997) (emphasizing that "the antitrust laws protect competition, not competitors"); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch., Inc.*, 516 F. Supp. 2d 270, 293–94 (S.D.N.Y. 2007) (granting Rule 12(b)(6) dismissal of Section 1 rule of reason claim where plaintiff merely alleged its own exclusion from a percentage of the market). Because ACV's repetitive, conclusory allegations of injury to competition lack supporting factual detail of either direct or indirect injury, its rule of reason claim (Count II) must be dismissed. *See Kasada, Inc. v. Access Cap., Inc.*, 2004 WL 2903776, at *8 (S.D.N.Y. Dec. 14, 2004) (concluding that plaintiffs failed to plead injury to competition because "plaintiffs have not articulated with any particularity the effect of the

17

defendants' alleged actions on the [relevant] market" and their general allegations of injury to competition were "conclusory and unsubstantiated"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015) (dismissing plaintiffs' Section 1 claim, in part, because their "conclusory" allegations "simply recite[d] the legal conclusion that competition has been harmed without sufficient factual support").[10]

### III.    ACV's claim that AASC and the Physical Auction Defendants violated Section 1 by conspiring to abuse a private standard setting organization fails as a matter of law.

ACV's abuse of standard-setting claim (Count III) rests on the flawed premise that AASC's development of a popular and effective product renders it "a de facto consensus-oriented private standard-setting organization." Compl. ¶ 154. But ACV's own allegations make clear that AutoIMS is not an industry standard, and AASC is not a standard-setting organization ("SSO").

"Standard-setting organizations are voluntary membership organizations whose participants develop 'technical specifications to ensure that products from different manufacturers are compatible with each other,' address certain threshold safety concerns, or serve other beneficial functions." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 435 (4th Cir. 2015) (quoting *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 875 (9th Cir. 2012)). The standards set by SSOs articulate the minimum (usually technical) requirements for members of an industry to follow, and those standards are usually enforced by contract. *See, e.g.*, *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 400 (2d Cir. 2014) ("[S]tandard-setting organizations restrain the behavior of parties participating in the standard by contract.").

---

[10] Inasmuch as ACV hopes to satisfy the rule of reason analysis indirectly, that argument also fails because, as explained in Section V below, ACV has not alleged that Defendants possess market power in the defined relevant product market.

Neither AASC nor AutoIMS satisfies those criteria. ACV does not allege that AASC sets standards for the auto auction (or any other) industry. Rather, AASC developed and manages AutoIMS, an inventory management software. Compl. ¶¶ 40–44. Unlike an industry "standard," the use of AutoIMS is neither necessary nor required for industry participants. On the contrary, ACV admits that many vehicle consignors (including most used car dealerships) do not use AutoIMS at all. *Id.* ¶ 65. Indeed, not even all Commercial Consignors use AutoIMS, nor do all auto auction services integrate with AutoIMS. *Id.* ¶¶ 37, 118. That some Commercial Consignors may prefer to deal with auctions that have AutoIMS access is due to the efficiency and cost-savings that AutoIMS provides—not because they lack competing options. *Id.* ¶¶ 129–31.

Although ACV alleges that certain Defendants have referred to AutoIMS as an "industry-standard" solution, that sort of promotional puffery does not equate to a "standard" in the legal sense. *See Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 45 (S.D.N.Y. 2015) (dismissing plaintiffs' Section 1 claim that was based, in part, on the theory that defendant was an abusive "standard-setting" organization because defendant "does not purport to create industry standards for competitors in the market"). The Complaint does not contain a single allegation that AutoIMS access is necessary for auto auction platforms like ACV to provide wholesale auction services.

Further, even if AASC could be deemed an SSO, Count III would still fail for other reasons. To plead a claim based on abuse of a private SSO, a plaintiff "must show either that it was barred from obtaining approval of its products on a discriminatory basis from its competitors, or that the conduct as a whole was manifestly anticompetitive and unreasonable." *Eliason Corp. v. Nat'l Sanitation Found.*, 614 F.2d 126, 129 (6th Cir. 1980) (footnote omitted); *see also In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1278 (C.D. Cal. 1997). While ACV asserts that AASC refused to grant ACV a license to AutoIMS, it fails to allege facts showing that AASC approved or

disapproved of ACV's products, or had any power to do so. There are simply no allegations in the Complaint that AASC's refusal to license AutoIMS has prevented ACV from developing and marketing its platform to customers or from accessing "other" vehicle inventory management software. *Id.* ¶ 123. On the contrary, ACV acknowledges that it has seen great success selling its online auction services even without access to AutoIMS. *Id.* ¶¶ 64–65.

The allegation that some customers decided not to use, or ceased using, ACV's service because it does not offer all the benefits of AutoIMS are immaterial to ACV's claim. *Id.* ¶¶ 129–31. The fact that ACV has not built a product that satisfies all of its customers does not mean that defendants abused a private SSO. *See Hassan v. Spicer*, 2006 WL 228958, at *4 (E.D.N.Y. Jan. 31, 2006) (dismissing Section 1 claim brought by doctor against accrediting organization for denying accreditation because, among other things, payors' requirement that doctors must be accredited was a voluntary, unilateral choice); *accord Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294–95 (5th Cir. 1988). Simply put, no allegations show that the development of AutoIMS abused any standard-setting process or that the determination to limit AutoIMS access to physical auctions was unreasonable. ACV's conclusory allegations to the contrary are insufficient as a matter of law. *See Lai v. USB-Implementers F., Inc.*, 2015 WL 12746705, at *5–6 (C.D. Cal. Mar. 11, 2015) (granting Rule 12(b)(6) dismissal of abuse of standard-setting claim after "[e]xcluding conclusory statements" in the complaint and finding plaintiff insufficiently alleged its excluded product was not certifiable under the standard).

Finally, as set forth in Section I above, the Complaint lacks plausible factual allegations suggesting that AASC and the Physical Auction Defendants conspired to deprive ACV of AutoIMS. Absent these allegations, ACV cannot maintain an abusive standard-setting claim under

Section 1. *See Bilinski*, 96 F. Supp. 3d at 45 ("[T]he existence of standard-setting authority does not create a free-standing antitrust claim absent a Section 1 conspiracy or Section 2 monopoly.").

**IV.     ACV's Section 2 monopolization and conspiracy to monopolize claims (Counts IV & V) are not legally cognizable.**

ACV's Section 2 monopolization claims fail because the antitrust laws do not require a company to deal with or provide access to a competitor absent a prior voluntary course of dealing between the alleged monopolist and the competitor. ACV's demand to free-ride on AASC and its shareholders' investment and work finds no basis in the law.

**A.     ACV's Complaint lacks factual allegations of anticompetitive conduct under either a refusal-to-deal or false-marketing theory.**

To plead a Section 2 claim, it is not enough to allege monopoly power;[11] ACV must also allege facts that show Defendants "willfully acquired or maintained that power in the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 495 (2d Cir. 2004). To satisfy that requirement, a plaintiff must allege that the defendant engaged in anticompetitive conduct condemned by the antitrust laws. *See Trinko*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful [under Section 2] unless it is accompanied by an element of anticompetitive *conduct*."). ACV claims that AASC's refusal to provide AutoIMS access is the predicate exclusionary conduct. It is not. The antitrust laws are clear and preserve "the long recognized right" of businesses to "freely . . . exercise [their] own independent discretion as to parties with whom [they] will deal." *Id.* at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). And for good reason. To hold otherwise would allow competitors to inappropriately freeride on others' investments, inhibiting the very competitive dynamic the antitrust laws seek to preserve. *See Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36, 55

---

[11] The market definition and monopoly power issues are discussed in Section V below.

(1977) (stating that prevention of free riding is a legitimate, procompetitive justification because, otherwise, the "services might not be provided").

The Second Circuit's guidance is clear and proscriptive: "'the sole exception to the broad right of a firm to refuse to deal with its competitors' comes into play only 'when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor.'" *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d at 52–53). ACV does not—and cannot—allege that AASC has terminated a prior course of dealing. AASC has never licensed AutoIMS to ACV, so its refusal to do so now cannot support a Section 2 monopolization claim.[12] *See In re Elevator Antitrust Litig.*, 502 F.3d at 54 (affirming dismissal of Section 2 claims because they did "not fall within the sole exception to the right of refusal-to-deal" because "the complaint [did] not allege that defendants terminated a prior relationship").

Recognizing that a Section 2 claim predicated on a unilateral refusal to deal is dead on arrival, ACV appears to pivot toward a theory that AASC's refusal to provide access violates Section 2 because it made "misleading" statements when promoting AutoIMS to vehicle consignors in the late 1990s and early 2000s. *See* Compl. ¶ 170 ("AASC engaged in exclusionary conduct by making knowingly false statements regarding AASC's willingness to openly license AutoIMS . . . . That representation was intentionally false."). But no antitrust case holds that a company must provide access to a competitor if its advertisements made decades earlier were false and misleading. The sole harm ACV alleges in its Complaint continues to be predicated on AASC's refusal to provide access to AutoIMS, and that could be unlawful only if AASC

---

[12] ACV's allegations that it has successfully competed also preclude a Section 2 claim under the "essential facilities" doctrine—which is generally reserved for natural monopolies (like a power line) that provide truly essential inputs without which competition in a relevant market would be eliminated. *See, e.g.*, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–79 (1973).

terminated a prior voluntary course of dealing with ACV—a fact ACV has not alleged. *In re Adderall XR*, 754 F.3d at 134.

Moreover, even if the law supported a duty to deal based on old advertising, that would get ACV nowhere, as the advertising at issue here was neither false nor misleading.[13] While ACV claims that AASC made broad claims of its willingness to openly license AutoIMS (Compl. ¶¶ 46, 50, 124, 170, 179), ACV's *only* identified source is a June 12, 2000 industry newsletter. *See id.* ¶ 50 ("On June 12, 2000, *Automotive News* amplified AASC's standard marketing pitch, stating that, '[AASC] was created to provide a nonproprietary Internet system for use by the *entire auction industry*.'"). But that statement was not "false." In 2000, the auto auction industry was entirely physical; online auctions like ACV's did not exist. *See id.* ¶¶ 64–65 (describing ACV's "goal" as "to disrupt the traditional physical used vehicle auction model by introducing an innovative online-only marketplace," which it did in June 2015). Any assertion that consignors in the early 2000s would not have adopted AutoIMS if promotional materials had explicitly stated it was for use with "physical" auctions (which, again, were all that existed at the time) is entirely speculative and implausible. Nor has ACV alleged facts that the large Commercial Consignors who adopted

---

[13] ACV does not allege that AASC made false statements about ACV's business that resulted in lost sales for ACV. As a result, this case does not resemble those where courts have considered false advertising as potential exclusionary conduct. Regardless, courts routinely hold that Section 2 claims predicated on deceptive marketing theories are presumptively flawed and require a plaintiff to plead particularized allegations to "overcome" that presumption. *See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) ("[A] plaintiff asserting a monopolization claim based on misleading advertising must 'overcome a presumption that the effect on competition of such a practice was *de minimis*.'"); *In re Keurig Green Mountain Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 240 (S.D.N.Y. 2019) (stating that a Section 2 plaintiff alleging a misleading advertising theory must show the representations were "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals"). ACV fails to allege the sort of facts needed to support a misleading advertising claim.

AutoIMS were unsophisticated customers "without knowledge of the subject matter." *In re Keurig*, 383 F. Supp. 3d at 240. Because ACV's Section 2 claim fails to allege exclusionary conduct, the Court should dismiss Count IV.

### B.      ACV's conspiracy to monopolize claim (Count V) likewise fails to state a claim.

To state a conspiracy to monopolize claim under Section 2, a plaintiff must show "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). For the same reasons outlined above in Section I, the Complaint does not plausibly allege concerted action, so the Section 2 conspiracy claim must be dismissed as well. *See All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*, 596 F. Supp. 2d 630, 642 (E.D.N.Y. 2009) ("As *Twombly*'s pleading requirements apply equally to Section 1 and Section 2 conspiracies, the court dismisses the Section 2 claim of conspiracy to monopolize.").

Setting aside ACV's conclusory allegations (Compl. ¶ 177), the Complaint also fails to provide any factual allegations showing a "specific intent to monopolize." *Volvo N. Am. Corp.*, 857 F.2d at 73–74.[14] The closest ACV gets is a single quote from a former CEO of ADESA, Inc., who said that former employees of several Defendants "share[d] thoughts on how our industry could work together to put a fence around our customers, preventing outside third parties from putting us out of business." Compl. ¶ 56. Evincing an intent to maintain relationships with customers and to avoid going out of business is hardly the same thing as an intent to monopolize the inventory management systems market (the alleged market for the Section 2 claims, but a

---

[14] With respect to NAAA, ACV alleges nothing at all. Although NAAA is named in Count V, the only NAAA-related allegation is that "Defendants used Defendant NAAA as a vehicle to execute their false promise to license to the entire industry." Compl. ¶ 180. ACV does not allege that NAAA participated in a conspiracy, had an intent to monopolize, or took an act of any kind at all, much less an "overt act[] in furtherance of the conspiracy." *Volvo N. Am. Corp.*, 857 F.2d at 74.

market in which none of the Physical Auction Defendants competes). Absent some factual allegations of Defendants' specific intent to monopolize, the conspiracy claim cannot stand. *See Michael E. Jones. M.D., P.C. v. UnitedHealth Grp., Inc.*, 2020 WL 4895675, at *11 (S.D.N.Y. Aug. 19, 2020) ("Claims for attempted monopolization and conspiracy to monopolize require factual allegations from which the Court can plausibly infer that Defendants have a specific intent to monopolize . . . .").

## V.    ACV's Section 1 and Section 2 claims fail because ACV has not pled the existence of a plausible relevant market or the existence of market power.

ACV's Section 1 conspiracy claims under the rule of reason (Counts II and III) and Section 2 claims (Counts IV and V) also fail because ACV has not alleged any plausible relevant market, "which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (quoting *Mathias v. Daily News, LP*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001)). Additionally, ACV fails to allege facts to support a claim that Defendants have market power (or monopoly power) in any relevant market.[15]

### A.    The identified markets for ACV's Section 1 and Section 2 claims are implausible and inadequately pled.

A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 404 (1956). "The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes, because the ability

---

[15] To show monopoly power, it generally is necessary to define a relevant product market. *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002); *see also Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254 (S.D.N.Y. 1995) ("[T]o survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market . . . .").

of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). The products included in the relevant market do not need to be identical. Instead, ACV must allege a market in terms of cross-elasticity of demand—that is, the market must include all products that consumers would turn to in response to a price increase. *AD/SAT*, 181 F.3d at 227.

"[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997)). Courts in the Second Circuit routinely dismiss antitrust claims for failure to plead required relevant markets. *See, e.g.*, *Cinema Vill. Cinemart v. Regal Ent. Grp.*, 708 F. App'x 29, 31 (2d Cir. 2017); *Singh v. Am. Racing-Tioga Downs, Inc.*, 2021 WL 6125432, at *9–10 (S.D.N.Y. Dec. 28, 2021); *Concord Assocs.*, 817 F.3d at 53.

Hoping to circumvent its admission that the actual product market in which ACV and the Physical Auction Defendants operate features "robust competition" (Compl. ¶ 112), ACV gerrymanders a new market to fit its Section 1 claims: "Auction Services Integrated with a Standardized Vehicle Inventory Management System." *Id.* ¶¶ 113–21. ACV claims that this is a distinct market that includes auctions "integrate[d]" with "the Standardized Vehicle Inventory Management System on which [Commercial Consignors] have come to depend," i.e., AutoIMS. *Id.* ¶ 114. But ACV fails to plead any facts regarding interchangeability or cross-elasticity of demand between its gerrymandered market and the general auction services market. Nor can it: the fact that many vehicle consignors sell their inventory outside of ACV's identified market

shows that competition exists in a larger market. *Id.* ¶¶ 64–65, 112. Indeed, ACV ignores the fact that many consignors do not use a vehicle inventory management system at all, and it attempts instead to define its identified market based solely on the preferences of some unspecified subset of Commercial Consignors that purportedly "depend" on AutoIMS. *Id.* ¶ 114. ACV admits that Commercial Consignors only "distinguish" between auction services generally and those integrated with a vehicle inventory management system, and some prefer the latter. *Id.* ¶ 115. This is not enough. *See Grp. Health*, 649 F.3d at 156 (concluding that "the market alleged in the [plaintiff's] complaint is legally insufficient because it is defined by the [plaintiff's] preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) ("Customer preferences towards one product over another do not negate interchangeability."). ACV does not allege, as it must, that Commercial Consignors would continue using an auction services provider that is integrated with AutoIMS even in the face of a price increase.

For its Section 2 claims, ACV's conclusory allegations and *ipse dixit* approach to defining a relevant product and geographic market also falls short of the Second Circuit's requirements. ACV changes its market definition for its Section 2 claims to the market for "Standardized Vehicle Inventory Management Systems" (as opposed to the market for auctions that are integrated with those systems). But that market definition also fails because it does not encompass all interchangeable products. The relevant (and conclusory) allegations are contained in a single section (Compl. ¶¶ 122–27) that proclaims the existence of such a market without providing any factual support. Although those paragraphs note the "existence of other vehicle inventory management system software" (*id.* ¶ 123), they provide no information on who those competitors are, what services they provide, or what those services cost. *See Mathias*, 152 F. Supp. 2d at 481–

82 ("It is clear from the face of the complaint that the [plaintiffs] have failed to allege a viable product market. . . . The first fatal flaw . . . is that [the market definition] does not even reference the rule of reasonable interchangeability. There is no discussion of other products in the market that potentially compete . . . , of arguably competing products that should not be included [in] the market, or of the factors that make the [identified market] a unique market. This failure to reference the rule of interchangeability is alone grounds for dismissal."). Nor do they offer any information about the consequences of an increase in AutoIMS's prices (e.g., would Commercial Consignors decide to operate systems themselves or choose an online option like ACV to sell vehicles).

With respect to the definition of a geographic market, ACV's Complaint fares no better. It declares that the market is the "United States." Compl. ¶ 126. Given that AutoIMS is software and that software can be freely used across borders, there is no explanation as to why the relevant geographic market would not be international in scope or whether alternatives are available internationally that can be used in the United States. *See Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015) (granting motion to dismiss when plaintiff failed to allege why "geographic market is properly limited to the United States"). ACV's conclusory geographic market allegations are insufficient. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir. 1991) ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.").

28

**B.      Having failed to adequately plead a relevant market, ACV fails to plead market power and monopoly power.**

Even if "Auction Services Integrated with a Standardized Vehicle Inventory Management System" were a relevant market, ACV is *silent* as to Defendants' market power in that market.[16] The Complaint does not contain any allegations concerning the Physical Auction Defendants' alleged shares in the specified market. Instead, ACV attempts to confuse the issue by alleging that *AutoIMS* is popular with some Commercial Consignors. *See, e.g.*, Compl. ¶¶ 114, 117. But AutoIMS's alleged popularity as a vehicle inventory management system cannot take the place of factual allegations regarding *Defendants'* actual sales or market shares. This gap in the Complaint is especially glaring given ACV's admission that AASC (a joint venture owned by defendants Manheim, ADESA Inc., ServNet, and IAASC) licenses AutoIMS to other auction services companies who compete in the same market as its founders. *See, e.g.*, *id.* ¶ 101. Thus, even assuming the truth of those allegations regarding what percentage of "finance companies" used AutoIMS to process new loans or leases (*id.* ¶ 118), those numbers tell us nothing about the percentage of *auctions* that use AutoIMS, let alone how many of those were conducted by auction providers *other* than the Physical Auction Defendants. ACV further admits that "other vehicle inventory management software" exists (*id.* ¶ 123), but it is silent as to the identities or market shares of auction service providers that use that software. There is simply no basis for the Court to conclude that any Defendant has market power in the defined market.

Similarly, ACV fails to provide a factual basis for inferring that AASC has monopoly power in the market for "Standardized Vehicle Inventory Management Systems." While it asserts

---

[16] Neither AASC nor NAAA provides "auction services" and therefore could not possibly have power in the purported market for "Auction Services Integrated with a Standardized Vehicle Inventory Management System."

that AASC has a "market share of almost 100 percent" (*id.* ¶ 172), it fails to provide any information about other competitors' shares.[17] ACV's allegations are also contradictory and nonsensical given its admission that a large percentage of vehicles sold by Commercial Consignors do not use AutoIMS. *See id.* ¶ 37 (alleging 78.6% of all car leases are processed through AutoIMS and 64.6% of car loans), ¶ 114 (alleging only that "many" Commercial Consignors prefer an integrated inventory management system). Despite this, there is no quantification or analysis of Commercial Consignors' use of competitor systems like ACV, other inventory management tools, or their own internal inventory management systems. Courts in the Second Circuit routinely dismiss complaints that are devoid of the factual allegations required to set forth a relevant geographic and product market. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("Cases in which dismissal on the pleadings is appropriate frequently involve . . . failure even to attempt a plausible explanation as to why a market should be limited in a particular way.").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Joint Motion to Dismiss.

---

[17] Aside from its complete failure to allege facts showing the existence of monopoly power, ACV's monopolization claims are also nonsensical in the context of its defined relevant market—Standardized Vehicle Inventory Management System software. The Complaint does not explain how AASC's *refusal* to license AutoIMS to ACV could possibly enhance AASC's alleged monopoly power. If anything, the opposite is true: because ACV is a prospective new customer, allowing ACV to utilize AutoIMS would *increase* AASC's share. For example, if AASC currently has 100% market share, as alleged, it would continue to have 100% market share if it provided access to ACV. If AASC has less than 100% market share, adding ACV as a customer would only *increase* AASC's share. That highlights the fallacy of ACV's allegations and underscores why ACV should be required to compete with AASC, not free-ride on its investment.

Dated: November 11, 2022                         Respectfully submitted,

                                                 */s/ Steve Penaro*
                                                 Steve Penaro
                                                 ALSTON & BIRD LLP
                                                 90 Park Avenue
                                                 New York, NY 10016
                                                 (212) 210-9400 (T)
                                                 (212) 210-9444 (F)
                                                 steve.penaro@alston.com

                                                 Valarie Williams (pro hac vice forthcoming)
                                                 ALSTON & BIRD LLP
                                                 560 Mission Street
                                                 Suite 2100
                                                 San Francisco, CA 94105
                                                 (415) 243-1058 (T)
                                                 (415) 243-1000 (F)
                                                 valarie.williams@alston.com

                                                 Matthew Kent (pro hac vice forthcoming)
                                                 Andrew Hatchett (pro hac vice forthcoming)
                                                 ALSTON & BIRD LLP
                                                 1201 West Peachtree Street
                                                 Atlanta, GA 30309
                                                 (404) 881-7000 (T)
                                                 (404) 881-7777 (F)
                                                 matthew.kent@alston.com
                                                 andrew.hatchett@alston.com

                                                 *Counsel for Auto Auction Services*
                                                 *Corporation*

*/s/ Vincent E. Doyle III*                       */s/ Jeffrey L. Kessler*
Vincent E. Doyle III                             Jeffrey L. Kessler
CONNORS LLP                                      Eva W. Cole
424 Main Street, Suite 1000                      George E. Mastoris
Buffalo, NY 14202                                David Feher
Telephone: (716) 852-5533                        WINSTON & STRAWN LLP
ved@connorsllp.com                               200 Park Avenue
                                                 New York, NY 10166-4193
Jennifer L. Giordano                             Tel.: +1 212 294 6700
Allyson Maltas (pro hac vice forthcoming)        Fax: +1 212 294 4700
LATHAM & WATKINS LLP                             JKessler@winston.com
555 Eleventh Street, NW Suite 1000               EWCole@winston.com
Washington, DC 20004-1304                        GMastoris@winston.com

Telephone: (202) 637-1013
Jennifer.Giordano@lw.com
Allyson.Maltas@lw.com

*Attorneys for Defendant*
*Manheim Auctions, Inc.*

/s/ John J. Hamill
DLA PIPER LLP (US)

Michael P. Murphy
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10036
Tel: +1 212-335-4755
Fax: +1 917-778-8655
michael.murphy@dlapiper.com

John J. Hamill (*pro hac vice*)
Michael S. Pullos (*pro hac vice*)
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Tel: +1 312-368-4000
Fax: + 1 312-236-7516
john.hamill@dlapiper.com
michael.pullos@dlapiper.com

Dale K. Cathell (*pro hac vice*)
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209
Tel: +1 410-480-4122
Fax: +1 410-580-3001
dale.cathell@dlapiper.com

*Counsel for Defendant*
*Independent Auto Auction Services*
*Corporation*

/s/ Elizabeth F. Ahlstrand
Elizabeth F. Ahlstrand
Sean L. McGrane (pro hac vice forthcoming)
SQUIRE PATTON BOGGS (US) LLP
1211 Avenue of the Americas, 26th Floor

DFeher@winston.com

*Counsel for Defendant ADESA, Inc.*

/s/ Brittany E. Lawrence
Joseph J. Porcello
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Tel.: (315) 413-7113
jporcello@barclaydamon.com

Brittany E. Lawrence
BARCLAY DAMON LLP
Five Star Bank Plaza
100 Chestnut Street, Suite 2000
Rochester, New York 14604
Tel.: (585) 295-4320
blawrence@barclaydamon.com

*Attorneys for Defendant*
*ServNet Auction Group*

/s/ Noah J. Kaufman
Noah J. Kaufman (pro hac vice)
MORGAN LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110

32

New York, NY 10036
Tel.: +1 212 872 9800
Fax: +1 212 872 9815
elizabeth.ahlstrand@squirepb.com
sean.mcgrane@squirepb.com

Brian A. Cabianca (pro hac vice
forthcoming)
David S. Norris (pro hac vice forthcoming)
SQUIRE PATTON BOGGS (US) LLP
2325 E Camelback Rd, Suite 700
Phoenix, AZ, 85016
Tel.: +1 602 528 4000
Fax: +1 602 253 8129
brian.cabianca@squirepb.com
david.norris@squirepb.com

*Counsel for Defendant*
*ADESA US Auction, LLC*

Tel.: (617) 341-7590
noah.kaufman@morganlewis.com

R. Brendan Fee (pro hac vice forthcoming)
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5136
brendan.fee@morganlewis.com

Emily E. Renshaw
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel.: (212) 309-6000
emily.renshaw@morganlewis.com

*Counsel for National Auto Auction*
*Association, Inc.*